# EXHIBIT 2

```
 1    UNITED STATES DISTRICT COURT
      DISTRICT OF CONNECTICUT
 2    CIVIL CASE NO. 3:14-CV-1646-MPS
      ---------------------------------------x
 3    CHARLES HUDSON AND ALEESHA HUDSON,

 4        Plaintiffs,

 5        VS.

 6    AISHA BABILONIA, SLM, SALLIE MAE, INC.,
      SALLIE MAE BANK, AND PFS/PROGRESSIVE
 7    FIN SERV, INC.,

 8        Defendants.
      ---------------------------------------x
 9

10                D E P O S I T I O N

11        The deposition of CHARLES HUDSON, taken on

12    behalf of the Defendants in the hereinbefore

13    entitled action, before Francine Garb, a Certified

14    Shorthand Reporter and Notary Public within and

15    for the State of Connecticut, commencing at 9:06

16    a.m., on November 9, 2015, at the offices of

17    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,

18    281 Tresser Boulevard, Suite 602, Stamford,

19    Connecticut 06901.

20

21    COURT REPORTER:  FRANCINE GARB, CSR

22    LICENSE # 139

23

24

25
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                    Charles Hudson

```
 1        Q     Does your wife have credit cards in your
 2   name?
 3        A     No, sir.
 4        Q     Do you have a personal e-mail account?
 5        A     Yes, sir.
 6        Q     What is the e-mail address for that
 7   account?
 8        A     I have to look in my phone.  It's
 9   Charleshuds@aol.com.
10        Q     So Charleshuds@aol.com?
11        A     Yes, sir.
12        Q     Do you have any other e-mail addresses?
13        A     No, sir.
14        Q     Have you ever used the e-mail address
15   CharlesHudson134@Gmail.com?
16        A     I can't recall.
17        Q     Have ever used a Gmail account before?
18        A     No, sir.
19        Q     Do you have any social media accounts,
20   and by social media, I mean Facebook, Myspace,
21   LinkedIn?
22        A     No, sir.
23        Q     Do you have a cell phone?
24        A     Yes, I have.
25        Q     What is your phone number?
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                    Charles Hudson

```
 1         A     It's (860)305-2200.

 2         Q     Does your wife have a cell phone?

 3         A     Yes, sir.

 4         Q     What is her cell phone number?

 5         A     It's (860)985-3949.

 6         Q     She carries her phone, and you carry

 7   your phone, right?

 8         A     Yes, sir.

 9         Q     Do you have any other cell phones?

10         A     No, sir.

11         Q     Do you have a house phone or a landline?

12         A     Landline, yes, sir.

13         Q     And what's the telephone number for

14   that?

15         A     (860)298-8625.

16         Q     Now, you are aware that we requested

17   your phone records in this matter?

18         A     Yes, sir.

19         Q     And when did you become aware that we

20   had requested your phone records in this matter?

21         A     I don't keep track of it.  I can't

22   recall.

23         Q     Within the last couple of weeks?

24         A     I don't recall.  I don't remember.

25         Q     You don't remember?
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                          Charles Hudson

```
 1        A     No.

 2        Q     Did you gather your phone records?

 3        A     The wife, she takes care of the -- that

 4   part of it.  So she gathered all of the

 5   information, so --

 6        Q     How long have you had your cell phone

 7   number?

 8        A     I think ever since cell phones came out.

 9   I can't remember how long it was, but I had it for

10   a very long time.  I can't recall, but a very long

11   time.

12        Q     Several years?

13        A     Several years.

14        Q     Have you ever used any other cell phone

15   number?

16        A     No, I haven't.

17        Q     Do you know if your wife has ever used

18   any other cell phone number?

19        A     Not that I know of.

20        Q     Do you recognize the cell phone number

21   (201)951-7570?

22        A     No.

23        Q     That is not your number?

24        A     No.

25        Q     You have never had that number?
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                              Charles Hudson

```
 1        A     Say that number again?

 2        Q     (201)951-7570.

 3        A     No, sir.

 4        Q     So if I call your wife's cell phone, you

 5   are not going to pick it up, right, your wife is

 6   going to answer?

 7        A     Right.

 8        Q     And conversely, if I call your cell

 9   phone, your wife is not going to pick it up, you

10   are going to answer it, right?

11        A     Exactly.

12        Q     Do you currently own any vehicles?

13        A     Yes, sir.

14        Q     You do?

15        A     Yes, I do.

16        Q     How many vehicles do you own?

17        A     Right now, I own two.

18        Q     What are those vehicles?

19        A     The Lexus and Nissan Frontier.

20        Q     What year is the Lexus?

21        A     The Lexus is 2015, 2014.

22        Q     2014 or '15?

23        A     Yes.

24        Q     Do you know what model it is?

25        A     I don't remember the model.
```

```
 1        Q      That wasn't my question.  Do you
 2   remember what my question was?
 3        A      Rephrase the question again.
 4        Q      I'm asking:  Do you remember what my
 5   question was?
 6               I understand you have a story that you
 7   would like to get out here.  Do you remember what
 8   my question was?
 9               MR. EGBARIN:  Objection.  You're
10        badgering the witness.  He's trying to answer
11        your question.
12               MR. SEIDLER:  He's not.  He doesn't even
13        recall what my question was.
14   BY MR. SEIDLER:
15        Q      What was my question?
16               MR. OSAKWE:  You rephrase it.
17               MR. SEIDLER:  No.  That's fine, I'll
18        rephrase it once he recalls what my question
19        was.
20   BY MR. SEIDLER:
21        Q      What was my question before, do you
22   recall?
23        A      You asked me if Navient Exhibit 3, if
24   that is the application --
25        Q      That was not my question.  My question
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

```
 1    was:  Do you know whether Sallie Mae was aware
 2    that this information was false when it was
 3    submitted?  Do you know that?
 4         A    I can't say Sallie Mae was aware.
 5         Q    You can't say that?
 6         A    I can't say that.  I don't know that.
 7         Q    Do you know whether Sallie Mae talked to
 8    anybody purporting to be you?
 9         A    I don't know that.
10         Q    You don't know that?
11         A    I don't know that.
12         Q    Had somebody called them purporting to
13    be you, you would agree with me that that would be
14    evidence of somebody trying to trick Sallie Mae --
15              MR. EGBARIN:  Objection.
16         Q    -- wouldn't you?
17              MR. OSAKWE:  Objection to the form of
18         the question.
19              MR. SEIDLER:  What's the objection?
20              MR. OSAKWE:  Form of the question.
21              MR. EGBARIN:  You are asking him to draw
22         conclusions from the evidence.  He's not an
23         expert.
24              MR. SEIDLER:  I'm not asking for expert
25         testimony, sir, and you are offering an
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                           Charles Hudson

 1    have looked closely, they could have realized that
 2    the information was incorrect?
 3         A    If they called that address, they would
 4    have seen that this guy never lived in New York.
 5    They could see that all of my addresses are in
 6    Connecticut.
 7         Q    Okay.  And how was Sallie Mae to know
 8    you didn't live in New York?  What would they have
 9    checked to determine that?
10         A    They could dig deep and find my phone
11    number.  They should have dug deep.  They didn't
12    have my information.  They didn't have my phone
13    number on record to call me up, but they did --
14    now that they need to get paid, so now they call
15    me up.  Now they find my phone number.  So they
16    could have dig a little bit deeper.
17         Q    But you can't say one way or another
18    that Sallie Mae knew that the information that was
19    submitted was false when they approved the loan,
20    can you?
21         A    I can't say that.
22         Q    Do you agree that Ms. Babilonia also
23    attempted to defraud Sallie Mae?
24         A    I can't say that.
25              MR. OSAKWE:  Objection.  Are you asking

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                     Charles Hudson

```
 1        for an opinion?
 2             MR. SEIDLER:  Yes, I'm asking for his
 3        opinion.
 4        A    I can't say that.
 5        Q    You don't know whether she was trying to
 6   defraud Sallie Mae?
 7        A    I can't say that.
 8        Q    She was trying to defraud you, right?
 9        A    My information was used.
10        Q    So she was trying to defraud you?
11        A    So I can't say -- well, she is trying to
12   defraud me because somebody is using my
13   information.
14        Q    And she is providing your information
15   and representing it to be true to Sallie Mae,
16   correct?
17        A    When it's not true.
18        Q    I understand that.  But she is
19   representing it to be true, right?
20        A    I would say.
21        Q    So she is lying to Sallie Mae, isn't
22   she?
23        A    I would say.
24        Q    So she is lying to Sallie Mae to try to
25   get a loan with your name on it?
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.
11/09/2015                                                    Charles Hudson

```
 1        A     With my name on it.

 2        Q     Is that correct?

 3        A     That is correct, from the information

 4   that is presented here.

 5        Q     So Sallie Mae was being lied to here by

 6   Ms. Babilonia?

 7        A     Well, they have an opportunity --

 8        Q     That wasn't my question.

 9              MR. OSAKWE:  Let him finish answering

10        your question.

11              MR. SEIDLER:  He's not answering my

12        question, sir.  My question was --

13              MR. OSAKWE:  He's answering your

14        question.

15              MR. SEIDLER:  He's not answering my

16        question, sir.

17              MR. OSAKWE:  You asked a question, and

18        he's --

19              MR. SEIDLER:  Stop interrupting me, sir.

20              MR. OSAKWE:  Ask him a question, and he

21        will answer.

22   BY MR. SEIDLER:

23        Q     Ms. Babilonia --

24              MR. OSAKWE:  Are you striking the last

25        question or not?
```

```
 1   correct?

 2       A    I can't remember.

 3       Q    Now, did you speak to somebody on

 4   January 8th of 2014, somebody with Navient?

 5       A    Yes, I spoke to somebody.

 6       Q    Does that refresh your memory as to what

 7   date it would be?

 8       A    Yes, I spoke to somebody.

 9       Q    And do you recall who contacted you?

10       A    I don't remember his -- I remember his

11   first name was Ken.  I don't remember his last

12   name.

13       Q    Do you remember how you spell Ken?

14       A    K-E-N.

15       Q    Are you sure it wasn't K-E-N-N?

16       A    I don't remember.

17       Q    But it was Ken?

18       A    I know it was Ken, yes.

19       Q    Were you advised that that phone call

20   was being recorded?

21       A    Yes, I was.

22       Q    And were you asked to verify your phone

23   number?

24       A    I don't remember him saying that.  I

25   don't remember.
```

```
 1        opinion.
 2             MR. EGBARIN:  Objection.  He's not to
 3        testify as to his opinion, but as to his
 4        experience.
 5   BY MR. SEIDLER:
 6        Q    You can answer.
 7        A    Rephrase the question.
 8        Q    Sure.
 9             Can you understand why your answer where
10   you affirmed the Park Place address, and you
11   affirmed that there was a loan, but that Aleesha
12   was taking care of it, can you understand why that
13   would be confusing to Sallie Mae when you later
14   came back and said you never signed for a student
15   loan?
16        A    I wouldn't say that it was confusing,
17   because initially I had a conversation with Ken
18   and I told him I would get back to Aleesha and
19   somebody could get back to him.
20        Q    But you verified the address, right?
21        A    So I don't remember verifying the
22   address, but I said yes, because I was on my
23   earpiece.
24             From the initial call, why did I answer
25   yes, you know, okay, from the first when he says
```

```
 1   Aleesha.  So the first name and the last name,
 2   they correspond.  So I assume he was talking about
 3   Aleesha, but I knew that Aleesha takes care of the
 4   finance.  So I said I will have somebody call you
 5   back, so I figure they shouldn't be confused
 6   because Aleesha call him that very same day.  Once
 7   I got off the phone with Ken, I called her
 8   immediately.
 9        Q    Do you understand why verifying the Park
10   Place address and later saying you never co-signed
11   to anything would be somewhat confusing to
12   someone?
13        A    I would say at the time.  At that time.
14        Q    At that time, you could see it, right?
15        A    At that point.
16        Q    But you think that the information that
17   you provided later should have clarified that?
18        A    I would say should have clarified that,
19   yes.
20        Q    You can understand how it would have
21   been initially confusing, correct?
22        A    I would say the initial call.
23        Q    Yes.  Okay.
24             So following that call, it would have
25   been reasonable for Sallie Mae to think that you
```

```
 1        Q     Do you know what was discussed during
 2   that phone call?
 3        A     No.
 4        Q     We'll have to ask her about that, right?
 5        A     Right.
 6        Q     When is the next phone call that you
 7   participated in?
 8        A     I spoke to him the same day again.  I
 9   spoke to Ken, because I told him I would call him
10   back further that day.  So I did call him back,
11   and I gave him my address, because he said he was
12   going to send me the booklet with all of the
13   information.
14        Q     When was this?
15        A     That was on the same date.  It was
16   January 8.
17        Q     You spoke to him twice on January 8?
18        A     I spoke to him twice that day.  So he
19   said he was going to send me out the book with the
20   information because he told me what I needed to
21   do.
22        Q     What did he tell you?
23        A     He told me that I needed a police
24   record.  I need to get a police record.
25        Q     So he tells you on January 8th that you
```

```
 1    need to get a police record?

 2         A    Yes.

 3         Q    Did he tell you you needed to go through

 4    the fraud process?

 5         A    Yes.  I think I got a number from him.

 6    He gave me the number, and he said he's going to

 7    send me the book with all of the information.  So

 8    I said, okay, I will give you my address.

 9              I gave him 514 Hawthorne Lane, and a

10    week goes by or two weeks, and then he called me

11    back and asks me if I received the information,

12    and I told him no, I didn't receive any

13    information.

14              And I can recall he repeated that Park

15    Place address.  I'm not sure which address he

16    state.  I told him that is not my address, that is

17    the reason I didn't get it.  He said, okay, he's

18    going to mail it to me again.  So that is when I

19    got the information from Sallie Mae.

20         Q    When your wife made the phone call to

21    them, the second phone call that you had with Ken,

22    was that after Aleesha talked to them?

23         A    On that date, I would say.  I would say.

24         Q    So you talked to Ken first, then Aleesha

25    called?
```

1       Q       Did you both call them on January 13?

2       A       I'm not sure of the month and date, but

3    Aleesha and I was on the phone speaking to them at

4    one point.

5       Q       Do you recall it being roughly a week

6    later, a few days later, when you both called

7    them?

8               You remember you testified earlier about

9    a week later, you called them to say you hadn't

10   received the information?

11      A       I didn't call him, Ken called me.

12      Q       Ken called you?

13      A       Ken called me.  I told him I didn't

14   receive any information.  So he said, okay, he's

15   going to send it again to me.

16      Q       And during that phone call that Aleesha

17   was also on on the 13th, was she on the call at

18   that point, or is that a different call?

19      A       That was a different call.

20      Q       It was just you on the phone?

21      A       Just me and Ken.

22      Q       And at that point, for the first time at

23   that point, you told Ken, look, this isn't me?

24      A       Yes.

25      Q       This is -- I think somebody is using my

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                    Charles Hudson

```
 1    information, is that what you told him?

 2         A    Yes, yes.

 3         Q    And that is the first time you had

 4    raised that?

 5         A    Yes, because -- yes.

 6         Q    And Ken told you at that point that you

 7    needed again to contact the fraud department and

 8    file a police report, right?

 9         A    Yes.

10         Q    And he had already told you that back on

11    the 8th during your second phone call?

12         A    Yes, the second phone call, we talk

13    about that.

14         Q    So this was --

15         A    You know what --

16         MR. OSAKWE:  He's trying to answer your

17    question.

18         A    I don't remember speaking to him about

19    fraud on that very first date.  It was not the

20    first initial date.

21         Q    So there was only one call with you and

22    one call with your wife on the first day?

23         A    Two calls.  He spoke to me earlier that

24    day.  And later on, I think I called him back

25    after 6 in the evening, and I spoke to him again.
```

```
 1        Q     What did you say then?
 2        A     I think that is when he said he's going
 3   to send me the information because I told him I
 4   was going to call him back.  So when Aleesha spoke
 5   to him, I spoke to him after Aleesha did, and he
 6   told me, yes, he spoke to my wife and that is not
 7   the same person.
 8        Q     I'm confused because you said you didn't
 9   discuss fraud with him on the 8th, it was on the
10   13th.
11        A     No, I don't remember discussing fraud
12   with him on that day.
13        Q     Not on the 8th?
14        A     No, I don't remember discussing that.
15        Q     But he said he was going to send out the
16   fraud documentation?
17        A      I don't think it was that same day he
18   told me.  I can't remember.
19        Q     So you didn't discuss fraud at all on
20   the 8th, it was on the 13th?
21        A     I don't remember when we discussed it.
22        Q     Certainly on the 13th, you discussed it?
23        A     It could be before the 13th.  I don't
24   remember.  I don't remember.
25        Q     Even if it was before the 13th,
```

```
 1    definitely on the 13th, you discussed it, right?
 2         A    We discussed it.
 3         Q    You discussed fraud?
 4         A    Yes, we discussed fraud.
 5         Q    And if you look back at your affidavit,
 6    which I think was Exhibit 1, you say in Paragraph
 7    16, which was on Page 2, that you told Sallie Mae
 8    during a conversation on January 13th that you
 9    never co-signed any student loan for anyone, and
10    you didn't know who Aisha Babilonia was, correct?
11         A    Correct.
12         Q    And they advised you to submit a fraud
13    report and a police report at that time, right?
14         A    Right.
15         Q    You don't say that they advised you to
16    do it beforehand?
17         A    No, they didn't do it beforehand.
18         Q    Because this was the first time you had
19    raised fraud?
20         A    Yes.
21         Q    So you made a police report with the
22    Windsor, Connecticut police on February 25, 2014?
23         A    Yes.
24         Q    Why did you wait over a month to submit
25    the first police report?
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                            Charles Hudson

```
1    away.  So I gave him my e-mail address, and that's
2    how I got it.
3         Q    And you were also told not only to
4    submit a police report, but also a fraud report or
5    affidavit, correct?
6         A    That's correct.
7         Q    And you were told to contact the fraud
8    department?
9         A    Yes.
10        Q    And did you do that?
11        A    Yes, I did.  I remember calling the guy.
12   I don't remember what the person's name was.  He
13   told me that -- because his first initial words to
14   me was they probably -- maybe they have the wrong
15   person.
16             So I gave him all of my information.  I
17   said, yes, I have it right here, all of the
18   information right here.
19        Q    And what did he say?
20        A    He just tell me what I needed to do,
21   what I needed to send in.
22        Q    You needed additional information?
23        A    No, I didn't need additional
24   information.  He just told me the same thing that
25   Ken was telling me, that I need a police report,
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                    Charles Hudson

```
 1    and after that, just send it to them and they will
 2    do an investigation.
 3         Q    Also that you needed a fraud report and
 4    an affidavit, right?
 5         A    Yes.
 6         Q    Do you remember when you contacted the
 7    fraud department?
 8         A    No, I don't remember.
 9         Q    Was it a week later, two weeks later?
10    Was it after you had contacted the police?
11         A    You know what, I think I contacted the
12    fraud before I even called the police station.  I
13    think I did, I don't remember.
14              MR. SEIDLER:  Would you mark this.
15              (2/6/14 document from Sallie Mae marked
16         Navient Exhibit 12 for identification.)
17    BY MR. SEIDLER:
18         Q    Do you recognize Navient Exhibit 12?
19         A    I don't recall.
20         Q    Is it possible you received this?
21         A    Yes, I think was when -- I think this is
22    when I first spoke to Ken.  I don't remember this.
23         Q    Is it possible you received this or --
24         A    Possible, because my 514 Hawthorne Lane
25    is on there.  So probably I received this, yes.
```

```
 1        Q    And it says, "Don't delay.  We have an
 2   important telephone message for you," correct?
 3        A    Yes.
 4        Q    And that's your correct address, right?
 5        A    Yes.
 6        Q    And did you contact Sallie Mae or
 7   Navient to inquire about the message?
 8        A    I don't remember.  I don't remember
 9   this.  I don't remember.
10        Q    Is it possible that you called them on
11   February 6?
12        A    It could be possible, but there were a
13   lot of phone calls.
14        Q    Perhaps that was the date that you
15   called with your wife?
16        A    I don't remember what date.  I think she
17   probably can clarify that date.  I don't remember
18   the date.
19        Q    How many calls did you make to Sallie
20   Mae, both of you, together on the phone?
21        A    Both of us?  I think it was once or
22   twice.  Twice, I think it was.
23        Q    And you can't say for certain whether it
24   was February 6?
25        A    I can't remember.
```

```
 1        Q     Look at the bottom of Page 4.

 2        A     Yes, I see that.

 3        Q     And with this, you had not submitted a

 4   copy of the identity theft report yet, had you,

 5   because you didn't have it yet?

 6        A     The police report, we didn't have the

 7   police report.

 8        Q     And this is dated March 1, 2014; is that

 9   correct?

10        A     Yes.

11        Q     Had you submitted an affidavit yet in

12   support of your fraud report?

13        A     No.  No.

14              MR. SEIDLER:  Let's mark this as Navient

15         Exhibit 16.

16              (4/5/14 letter headed "Final Notice"

17         marked Navient Exhibit 16 for

18         identification.)

19   BY MR. SEIDLER:

20        Q     Do you recognize this document?

21        A     Yes.

22        Q     That appears to be an April 5, 2014

23   letter to you at your correct address on Hawthorne

24   Lane, correct?

25        A     Correct.
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                      Charles Hudson

```
 1        Q    And it states "Final Notice:  Loan and
 2   Default"; is that correct?
 3        A    Yes.
 4        Q    Now, had you supplemented your fraud
 5   report at this point?  Had you provided the police
 6   report yet?
 7        A    I think we did the police report at that
 8   time.
 9        Q    Do you know when that was?
10        A    Aleesha can give you the information on
11   that.
12        Q    I'm asking you, but I'll certainly ask
13   her?
14             MR. OSAKWE:  Objection.
15             MR. SEIDLER:  To what?
16             MR. OSAKWE:  Question asked, question
17        answered.
18   BY MR. SEIDLER:
19        Q    Can you recall when you submitted the
20   police report?  Do you know what day you submitted
21   it?
22        A    I don't remember what date it was.
23        Q    It might have been before April 5th, it
24   might have been after April 5th?
25        A    I can't say, I don't remember.
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

```
 1        Q     You don't know one way or the other?

 2        A     I don't remember.

 3        Q     But in any event, at this point it's

 4   clear that Sallie Mae/Navient still considered you

 5   to be in part responsible for this loan, right?

 6              MR. OSAKWE:  An objection as to the

 7        form.

 8        Q     You can answer.

 9        A     Could you rephrase it?

10        Q     Sure.

11              At any rate, from the face of this

12   document, at the time that Sallie Mae sent this

13   document, it believed that you were responsible

14   for this loan at least partially, correct?

15        A     I would say correct.

16        Q     I hand you what has been marked as

17   Navient Exhibit 17.

18              (5/11/14 document marked Navient Exhibit

19        17 for identification.)

20   BY MR. SEIDLER:

21        Q     Do you recognize Navient Exhibit 17?

22        A     Yes.

23        Q     So as of May 12th, you hadn't yet

24   submitted a completed fraud affidavit; isn't that

25   right?
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                    Charles Hudson

```
 1      A    I don't know.
 2      Q    You don't remember?  You may not have?
 3      A    But I can't say for sure.  I don't
 4 remember.  I don't recall.
 5      Q    It appears Sallie Mae had not received a
 6 fraud affidavit from you as of that time, correct,
 7 because they were asking you to submit one?
 8           MR. OSAKWE:  Objection as to the format
 9      of the question.
10      Q    You can answer.
11      A    Yes, I did.  We gave them one.
12      Q    I understand that, but you can't say
13 when you submitted it.
14           It appears that Sallie Mae had not
15 received one because they are asking you to submit
16 one in their May 12, 2014 affidavit; isn't that
17 right?  Sorry, correspondence?
18      A    I can't say.
19      Q    You don't know one way or the other?
20           MR. SEIDLER:  Would you mark this as
21      Navient Exhibit 18.
22           (7/17/14 document marked Navient Exhibit
23      18 for identification.)
24 BY MR. SEIDLER:
25      Q    Before you, sir, do you recall -- well,
```

```
 1    let me change that.  Go ahead and look at the
 2    document.
 3              (Witness perusing document)
 4        Q    Have you ever seen this document before?
 5        A    Yes.  I can't recall when I have seen
 6    it, but I think I remember seeing this.
 7        Q    When you filled out the fraud affidavit,
 8    did you give it to your attorney, or did you
 9    give -- or did you send it to Sallie Mae?  In
10    other words, did your attorney submit it to Sallie
11    Mae, or did you?
12        A    Aleesha mailed everything out, so
13    Aleesha took care of that part.
14        Q    Do you know -- do you happen to know
15    whether it was sent to your attorney or whether it
16    was sent directly to Sallie Mae?
17        A    I don't remember.
18        Q    The letter --
19        A    I think it was no.  I think it was no.
20        Q    The letter states, "Find attached
21    affidavit for Mr. Hudson in this regard."  So the
22    letter is attaching the affidavit.
23              Can you say with any certainty that the
24    affidavit was submitted prior to this letter?
25        A    I can't say.
```

```
 1        Q     Did there come a time when you ever
 2   submitted a complete fraud affidavit, including
 3   the blank information we discussed earlier?
 4        A     I don't recall.  I think we did.  I
 5   think so.
 6        Q     Do you specifically recall doing that?
 7        A     I think Greg did.  I'm not thinking.
 8   Gregory did.
 9        Q     Do you remember when that was?
10        A     No, I don't.
11        Q     Obviously Sallie Mae couldn't conduct
12   the complete investigation without having a
13   complete fraud affidavit, could it?
14             MR. OSAKWE:  Objection as to the form of
15        the question.
16        Q     You can answer.
17             MR. EGBARIN:  You are asking the witness
18        for conclusions --
19             MR. SEIDLER:  I'm sorry?
20             MR. EGBARIN:  You are asking the witness
21        to draw conclusions.
22             MR. SEIDLER:  Okay.  That is your
23        objection.
24   BY MR. SEIDLER:
25        Q     You can answer.
```

11/09/2015                                                          Charles Hudson

```
 1       A     I can't say for sure.  I can't say.

 2       Q     You don't know one way or the other?

 3       A     I don't know.

 4       Q     I'm going to hand you what has been

 5   marked as Navient Exhibit 19.

 6             (10/31/14 document marked Navient

 7             Exhibit 19 for identification.)

 8   BY MR. SEIDLER:

 9       Q     Do you recognize Navient Exhibit 19?

10       A     I can't remember.  I don't know.

11       Q     Is it possible you received this?

12       A     It's possible.  I don't remember.

13       Q     It states that they have conducted an

14   investigation and concluded that the information

15   provided regarding this loan to the consumer

16   reporting agencies is valid.

17             That's what it says, right?

18       A     That's what it says.

19       Q     It says, "If you still believe the loan

20   is not yours or that the loan is as a result of an

21   identity theft, please call our fraud department

22   at the number below."

23       A     That is what it says.

24       Q     Do you recall if you did that?

25       A     I can't recall.
```

 1     requested before that because that was a
 2     deficiency conference that we had.
 3         MR. EGBARIN:  That is correct, and we
 4     have complied with that deficiency.
 5         And regarding Navient Exhibit 1, which
 6     is the affidavit, I will have to state that
 7     counsel prepared the affidavit.
 8         MR. SEIDLER:  Okay.  Did you get that on
 9     the record?
10         So there's a discrepancy here.
11         MR. EGBARIN:  There's no discrepancy.
12         MR. SEIDLER:  I think he said he wrote
13     it, it was his words.
14         MR. EGBARIN:  It was, yes.  Counsel
15     prepared the affidavit based on his own
16     words.
17         MR. SEIDLER:  Let's get back to those
18     words.
19  BY MR. SEIDLER:
20     Q    You are still looking at the document?
21     A    Yes.
22     Q    So you assumed that Mr. Rondell misused
23  your personal information, correct?
24     A    Correct.
25     Q    You didn't have any facts in front of

```
 1    you that proved that, did you?

 2         A    This information got out.

 3         Q    Nobody told you that Mr. Rondell misused

 4    your personal information, did they?

 5         A    No, nobody ever told me that.

 6         Q    When you filed the police report -- have

 7    you produced that police report in this case, the

 8    police report against Mr. Rondell?

 9              You have?

10         A    Yes.

11              THE WITNESS:  Did I?

12         Q    I don't think so.

13         A    No.

14              MR. OSAKWE:  Are you answering your own

15         question?

16              MR. SEIDLER:  I'm asking him, and he's

17         saying no and looking at his wife.

18              Will you please produce a copy of that

19         report?

20              MR. EGBARIN:  I will make sure that the

21         report has been made.

22              MR. SEIDLER:  He said he made a police

23         report.

24              MR. EGBARIN:  That he made one in the

25         case against Sallie Mae, and he made one and
```

CHARLES HUDSON, ET AL. VS. AISHA BABILONIA, ET AL.

11/09/2015                                                Charles Hudson

```
 1          the report came out.
 2   BY MR. SEIDLER:
 3          Q     Is there a document associated with this
 4   police report?
 5          A     Yes.
 6          Q     Do you have that document?
 7                THE WITNESS:  Do we have that document?
 8                MR. SEIDLER:  If you have that document,
 9          will you please produce it?  Will you agree
10          to produce that?
11                MR. EGBARIN:  If we can find it, we will
12          give it to you.
13   BY MR. SEIDLER:
14          Q     And so you filed that on April 4, 2014;
15   is that right, according to Paragraph 20 of your
16   affidavit?
17          A     Yes.
18          Q     And you assumed that because information
19   got out, your personal information got out, it
20   must have gotten out because of Mr. Rondell; is
21   that right?
22          A     That's right.
23          Q     And when did you apply for a mortgage
24   modification through Mr. Rondell?
25          A     (No response).
```

```
 1   calling.
 2        Q    They stopped writing and calling then,
 3   that was in 2014?
 4        A    Yes.
 5        Q    Do you know how many times Sallie Mae or
 6   Navient contacted your husband at his cell phone
 7   number?
 8        A    No, I don't.
 9        Q    Do you know whether Sallie Mae ever used
10   an automated system to contact him?
11        A    I don't know if it's them, but he tells
12   me that a funny thing comes in where you hear
13   please hold, but it's not somebody, but you hear
14   that thing that says please hold.
15        Q    But neither you, nor he could say that
16   it was Sallie Mae?
17        A    No, I couldn't.
18        Q    And he couldn't say that to you, either?
19        A    No.
20        Q    You handle all of the finances for the
21   family?
22        A    Yes, I do.
23        Q    And when did you start handling all of
24   the finances?
25        A    I've always done that.
```

```
 1        Q     Did you have that discussion within the
 2   last month?
 3        A     I would say probably a month or two
 4   months.  I don't know.
 5        Q     Do you know how she knew whether it was
 6   still on your credit report?
 7        A     I think she would check my stuff.
 8        Q     She will check your credit report?
 9        A     Yes.
10        Q     Without you knowing that she was
11   checking it?
12        A     She would let me know.
13        Q     When was the last time she checked it?
14        A     I can't say, I don't remember.
15        Q     Now, earlier you stated that Sallie Mae
16   called you in November of 2013, and then you said
17   that you first spoke to Sallie Mae when -- the
18   first time they called you in January, January 8th
19   of 2014.
20              Do you recall which it is?
21        A     I don't recall.  I think it's 2014.
22        Q     You think it's January 2014?
23        A     When I got the first phone.
24        Q     Did you ever receive any prerecorded
25   calls?
```

```
 1       A     No.
 2       Q     Never?  Okay.
 3             And what telephone number did they
 4   contact you at?
 5       A     On my cell phone, (860)305-2200.
 6       Q     Do you know whether they ever called
 7   your wife's cell phone?
 8       A     That, I don't know.
 9       Q     Did you ever provide Sallie Mae or
10   Navient with a number to reach you at?
11       A     Yes, I did.
12       Q     And what number was that?
13       A     Actually, I didn't provide it.  They
14   called me on my cell phone, so I did not provide
15   them.
16       Q     After you spoke with them?
17       A     I think when I spoke with Ken, he said
18   is this a good number to reach you at, and I said
19   yes.
20       Q     And that was the cell phone number?
21       A     That was the cell phone number.
22       Q     And did you ask that they contact you
23   regarding the loan and specifically your
24   allegations of fraud?
25       A     No.
```

11/09/2015                                                    Charles Hudson

```
 1              MR. O'CONNOR:  Redirect.

 2              MR. OSAKWE:  We haven't asked anything

 3    yet.

 4              MR. SEIDLER:  It's not your turn yet.

 5    We go first, and then you guys go.

 6              MR. OSAKWE:  You have gone already.  He

 7    suspended.

 8              MR. SEIDLER:  That's fine, and I'm going

 9    again.

10   EXAMINATION (CONT'D)

11   BY MR. SEIDLER:

12        Q    How do you know that an auto dialer was

13   being used during any of the phone calls that were

14   being made to you?

15        A    I don't know that.

16        Q    You don't know?

17        A    I don't know.

18             Auto dialer?

19        Q    An auto dialer.

20             Let's look back at your Complaint,

21   Navient Exhibit 2.

22             Looking at Paragraph 14, you see it

23   says, "On November 20i3, Defendants, Sallie Mae

24   and Progressive, commenced collection activity on

25   the loan and used their automatic telephone
```