# EXHIBIT 3

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 2 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

```
UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
CIVIL CASE NO. 3:14-CV-1646-MPS
-------------------------------------x
CHARLES HUDSON AND ALEESHA HUDSON,

     Plaintiffs,

     VS.

AISHA BABILONIA, SLM, SALLIE MAE, INC.,
SALLIE MAE BANK, AND PFS/PROGRESSIVE
FIN SERV, INC.,

     Defendants.
-------------------------------------x
```

D E P O S I T I O N

The deposition of ALEESHIA HUDSON, taken on behalf of the Defendants in the hereinbefore entitled action, before Francine Garb, a Certified Shorthand Reporter and Notary Public within and for the State of Connecticut, commencing at 1:35 p.m., on November 19, 2015, at the offices of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 281 Tresser Boulevard, Suite 602, Stamford, Connecticut 06901.


COURT REPORTER:   FRANCINE GARB, CSR

LICENSE # 139

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 3 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

1   address.  Send a contact mail to both those
2   addresses and said your address that you list
3   doesn't correspond with your driver's license.
4        Q    Do you know whether Mr. Hudson's -- that
5   information was available to Mr. Rondell?
6        A    Yes.  We had to send driver's license,
7   we had to send Social Security card, because the
8   mortgage company wasn't like that.  We applied for
9   this modification since 2010, and they kept asking
10  and asking for things over, and over and over, and
11  every day, you have to give stuff.
12            And say something come in after 30 days,
13  you have to send in stuff all over again, and you
14  have to constantly send pay stubs.
15            And that's another thing, they should
16  have asked for pay stubs, and they would have seen
17  on the pay stubs that the address is not even
18  correct.
19       Q    One of your claims is Ms. Babilonia used
20  your husband's information to try to obtain a loan
21  or, in fact, obtained a loan from Sallie Mae by
22  representing that your husband was co-signing for
23  her?
24       A    That's what it shows on the credit
25  report.

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 4 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                      Aleeshia Hudson

```
 1       A    I know -- I don't know if Sallie Mae --
 2  oh, Navient.  It's the same thing.
 3            I don't know who it is, but I know calls
 4  have come through.
 5       Q    I'm asking specifically about your cell
 6  phone.
 7       A    My cell phone, not Charles.  I don't
 8  know who it is.
 9       Q    So you can't say whether Sallie Mae
10  called your cell phone?
11       A    No, I can't.  Because I never answered
12  the phone and someone say I'm calling about a
13  Sallie Mae loan.
14       Q    And you heard testimony earlier about
15  your husband's old phone?
16       A    Yes.
17       Q    Did you ever look for that phone?
18       A    I did.  Listen, I run a clean, tidy
19  house, and when I can't find something, I'm very
20  upset.
21       Q    Do you know what might have happened to
22  it?
23       A    No.  I am very upset.  Because even my
24  son has an iPod, and it broke down, and even one
25  of our friends were saying you could give him
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 5 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                          Aleeshia Hudson

```
 1   Charles' old iPhone because he's not going to make
 2   calls or anything on that.  He's going to do the
 3   same thing as the iPod.
 4              It was like, okay, we could give it to
 5   him.  So we didn't get around giving it to him.
 6   Now when we hear we can't find that, we have to go
 7   buy an iPod.
 8        Q    And you mentioned earlier there might be
 9   some stuff you might need to delete off the old
10   phone?
11        A    Yes.  And can you imagine that?
12        Q    You don't want it falling into the wrong
13   hands?
14        A    No.  I'm very upset because my house is
15   tidy.
16        Q    So the only calls from Sallie Mae that
17   you are aware of are calls to your husband's cell
18   phone?
19        A    And the house phone, the landline.  I
20   don't know who it is, but I have answered the
21   landline where they talk about the loan.
22              MR. SEIDLER:  Why don't we take a
23        45-minute lunch.  Is that okay?
24              (Time noted:  12:16 p.m.)
25   L U N C H E O N     R E C E S S     T A K E N
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 6 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.

11/19/2015                                                      Aleeshia Hudson

```
 1              A F T E R N O O N   S E S S I O N
 2                  (Time noted:  1:01 p.m.)
 3                  MR. SEIDLER:  Back on the record at
 4         about 1:00 p.m. here.
 5   BY MR. SEIDLER:
 6        Q    Do you understand that you are still
 7   under oath, Ms. Hudson?
 8        A    Yes.
 9        Q    I'm going to hand you what has been
10   marked as Defendants' Exhibit 39.
11                  (Affidavit in Support of Motion for
12         Default Judgment marked Defendants' Exhibit
13         39 for identification.)
14   BY MR. SEIDLER:
15        Q    Do you recognize what has been marked
16   Defendants' Exhibit 39 and handed to you?
17        A    Yes.
18        Q    What is it?
19        A    It's an Affidavit in Support of Motion
20   for Default Judgment.
21        Q    This is your affidavit?
22        A    Yes.
23        Q    Did you sign it on the last page there?
24        A    Yes.
25        Q    To be clear, we talked about your credit
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 7 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

```
 1   score earlier.  You said you had good credit?
 2        A    Yes, I have good credit where I get
 3   stuff.
 4        Q    This whole event has not affected your
 5   credit?
 6        A    No.
 7        Q    Nothing with Sallie Mae has affected
 8   your credit, it's your husband's credit?
 9        A    Yes.
10        Q    Nobody ever pulled your credit report as
11   far as you are aware?
12        A    No.
13        Q    Everything involved your husband's
14   credit?
15        A    Yes.
16        Q    Nothing involved your credit?
17        A    No.
18        Q    I want to go over a timeline here.
19             Looking at the second page, so your
20   husband first spoke with Sallie Mae on January 8th
21   when an individual named Ken called him; is that
22   about right?
23        A    Yes.
24        Q    In Paragraph 13, you spoke to Sallie Mae
25   on January 8?
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 8 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

```
 1      A    Yes.
 2      Q    And that was after your husband had
 3  spoken with them?
 4      A    Yes, he called me and told me that
 5  someone called about a loan, and they said to
 6  him -- someone called about a loan, a student
 7  loan, and he said I don't have a student loan, and
 8  they asked Aisha Bailey, and he said I don't have
 9  a student loan.  And I said where is the number,
10  and he gave me the number and I called the person.
11      Q    Did you know that in your husband's
12  first conversation with Sallie Mae -- and that was
13  an individual by the name of Ken?
14      A    Yes, he remembered.
15      Q    The same individual you spoke with?
16      A    Yes, that's the same individual.  I
17  guess his extension and stuff.
18      Q    Did you understand that your husband,
19  during that first conversation, had verified the
20  1436 Park Place address?
21      A    That's what he said.  You know what, I'm
22  not sure.  I'm not sure.
23      Q    Have you seen the transcript of the
24  conversation?
25      A    No.  No, I didn't look at it.
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 9 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                      Aleeshia Hudson

```
 1      Q    Would you like to see it?
 2      A    Yes, but if I see it, it's still not
 3 going to verify if I knew he said it.
 4      Q    Do you understand now that he verified
 5 that information?
 6      A    I know he said that when the person
 7 called him, and he -- and they asked him for
 8 Aleeshia, he thought it was me, and he said he was
 9 driving, he just heard that, he told them -- he
10 said she is not working and he said she pays the
11 bills.
12           And I said why are you giving
13 information to people without you knowing exactly
14 who they are talking about.  And then I think
15 afterwards he told me about the whole address
16 thing because I guess he didn't even get it on the
17 first conversation.
18      Q    So he verified the Park Place address,
19 right?
20      A    I guess he answered yes to whatever they
21 told him, yes.
22      Q    He also verified the telephone number as
23 a good number to contact him on his 2200 number?
24      A    Yes, he told me that part.
25      Q    And he verified that he knew about the
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 10 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                          Aleeshia Hudson

```
 1   loan at that point.  Now, we understand --
 2        A    He thought it was me.  He told me that.
 3   He thought they were referring to me.
 4        Q    So you understand how it would have been
 5   confusing for Sallie Mae to speak with him, and
 6   have him verify all of this information, and later
 7   come back and say I don't know anything about it?
 8        A    Not necessarily.  Because when I called
 9   them, they could have been unconfused, if there is
10   such a word, when I told them that it wasn't me.
11             And when I told them -- gave them my
12   information -- and actually the guy asked me for
13   my Social Security Number, and I said no, I'm not
14   giving it to you because I have always been told
15   not to give the Social Security Number over the
16   phone, if you want it, you can find it.  But I
17   said that information about me, I don't own a
18   student loan, I don't have a student loan.
19        Q    Following the conversation with your
20   husband, is it your understanding that Sallie Mae
21   would have believed that he co-signed on the loan?
22        A    They shouldn't have because I called
23   them the same day.
24        Q    I'm not talking about your phone call,
25   I'm talking about after the phone call with your
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 11 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

```
 1      Q    Why did you decide to call an attorney?
 2      A    Because when things like these, I don't
 3   really understand much, and if I see something, I
 4   said these people keep calling and stressing my
 5   husband.  Because he saw me, and he said what's
 6   wrong, and I said these people keep calling and
 7   stressing my husband, these Sallie Mae people, and
 8   he said what happened, and I explained it to him,
 9   and he said, okay, I'll send them a cease and
10   desist letter for you.
11      Q    We talked earlier about a report that
12   was made on Mr. Rondell?
13      A    Yes.
14      Q    Did anybody ever tell you not to sue
15   Mr. Rondell?
16      A    No.
17      Q    Did you ever discuss with anybody
18   whether you should sue Mr. Rondell?
19      A    No.
20      Q    Sitting here today, do you believe
21   Mr. Rondell let your husband's personal
22   information get out to other individuals?
23      A    I think he probably should have been
24   more careful because, you know, he's the one that
25   has the information.  I don't know if it was the
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 12 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

```
 1   same time that they had everything or whatever,
 2   and it just happened, but it's too incident.  And
 3   I'm thinking --
 4        Q    Too much to be a coincidence?
 5        A    Yes.  I don't know if the same people
 6   who took it, and they had it, and they thought
 7   they would try something, and nothing happened so
 8   they tried something else.  I'm not sure.
 9        Q    If you are saying he was not careful
10   enough with your information, why haven't you sued
11   him?
12        A    Because I didn't thought about suing
13   him.  The first thing did not affect us and did
14   not affect our credit or anything like that, and
15   his name is not on any paperwork that is involved
16   Charles' credit.  It's Aisha Babilonia and Sallie
17   Mae.  I don't see anything that stated that
18   Rondell John.  Because if I did, he would have
19   been sued.
20        Q    Is his name Rondell John or John
21   Rondell?
22        A    John Rondell.  I call him Rondell.
23        Q    So you don't know what his first name
24   is?
25        A    No.  I called him Rondell.
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 13 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                          Aleeshia Hudson

```
 1        Q    And you never asked Rondell if he knew
 2   Ms. Babilonia?
 3        A    No, I didn't.  I cursed him out about
 4   not only protecting or securing our information if
 5   it was caused through him.
 6        Q    Do you know whether he's ever been
 7   accused or convicted of a crime or fraud?
 8        A    Not that I know of.
 9        Q    Have you ever Googled his name?
10        A    No.  I guess I need to Google mine, too.
11        Q    When did you decide to file suit in this
12   matter?
13        A    After a long and lengthy requests and
14   stuff that we tried first with Sallie Mae, and
15   then Attorney Gregory tried, and nothing was
16   happening and then I guess -- I think the worst
17   was when we couldn't get the cars, and he said to
18   me I think you are going to have to sue these
19   people to get their attention.
20        Q    That is what Gregory told you?
21        A    Yes.
22        Q    And what did you say?
23        A    I said I just want Charles' credit and
24   our life back.
25        Q    And what did he say?
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 14 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

```
 1      A    Well, we provide information to our --
 2   the counsel and, then they typed it.
 3      Q    And that is not the information that you
 4   provided to your counsel contained in Paragraph
 5   19?
 6      A    It wouldn't have been that Mr. Rondell
 7   misused, it was more that he didn't protect our
 8   personal information.
 9      Q    On Paragraph 20, it says, "I
10   consequently filed another police report against
11   Mr. Rondell on April 4th."
12      A    Yes.  When my husband went to file the
13   police report, he had to give the information of
14   who has his information in New York.  So that is
15   the information that he gave to the police
16   department because he's the one who had it, but we
17   don't have anything that says Rondell John on it,
18   that he misused our information.  We don't have
19   anything that has his name on it.
20      Q    You just don't want to sue him because
21   he's a friend; isn't that right?
22      A    This friend, brother, sister, my mother,
23   if they did that to us, I would have sued, because
24   you know what?  They didn't care about us.  They
25   didn't think about our kids.
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 15 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                                    Aleeshia Hudson

```
 1        Q    You testified that he didn't protect
 2   your information, so why didn't you sue him?
 3        A    His name was not on anything for me to
 4   sue.  How was I going to sue him?  I can't fully
 5   prove that he is the one who they took it from.  I
 6   can't prove that.
 7             I can prove that Aisha took out a loan
 8   because her name is on the paper.  I can prove
 9   that Sallie Mae messed up Charles' credit because
10   Sallie Mae is on his credit report, but I can't
11   prove anything that says Rondell did anything
12   because I don't have anything to document that
13   that's him.
14        Q    But as you have testified today, he did
15   not keep your information safe, did he?
16        A    That is what I told him.
17        Q    You were lying when you told him that?
18        A    No, I wasn't lying.  That is what I told
19   him.  I said, "Did you keep our information safe?
20   I guess you didn't keep our information safe
21   because you are the one who had it in New York."
22        Q    And so you didn't think to file an
23   action against Mr. Rondell for being negligent
24   with your information?
25        A    No, I didn't thought about that.
```

Case 3:14-cv-01646-MPS   Document 102-7   Filed 12/30/15   Page 16 of 16

CHARLES HUDSON, ET AL. vs. AISHA BABILONIA, ET AL.
11/19/2015                                              Aleeshia Hudson

```
 1   calling.
 2        Q    They stopped writing and calling then,
 3   that was in 2014?
 4        A    Yes.
 5        Q    Do you know how many times Sallie Mae or
 6   Navient contacted your husband at his cell phone
 7   number?
 8        A    No, I don't.
 9        Q    Do you know whether Sallie Mae ever used
10   an automated system to contact him?
11        A    I don't know if it's them, but he tells
12   me that a funny thing comes in where you hear
13   please hold, but it's not somebody, but you hear
14   that thing that says please hold.
15        Q    But neither you, nor he could say that
16   it was Sallie Mae?
17        A    No, I couldn't.
18        Q    And he couldn't say that to you, either?
19        A    No.
20        Q    You handle all of the finances for the
21   family?
22        A    Yes, I do.
23        Q    And when did you start handling all of
24   the finances?
25        A    I've always done that.
```