# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| Charles Hudson & Aleeshia Bailey Hudson,<br><br>         Plaintiffs,<br><br>         v.<br><br>Aisha Babilonia, SLM Corporation, Sallie Mae, Inc.,<br>Sallie Mae Bank, & PFS/Progressive Financial<br>Services, Inc.,<br><br>         Defendants. | No. 3:14-cv-01646 (MPS) |

## MEMORANDUM AND ORDER

Plaintiffs Charles Hudson and Aleeshia Bailey Hudson assert claims under various consumer protection laws against Aisha Babilonia, SLM Corporation (now Navient Corporation ("Navient Corp.")), Sallie Mae Bank, Sallie Mae, Inc. (now Navient Solutions, Inc. ("NSI")), and PFS/Progressive Financial Services, Inc. ("Progressive") arising from the theft of Mr. Hudson's identity, the use of his identity to obtain a student loan, and efforts to collect a delinquency on that loan.  Navient Corp., Sallie Mae Bank, and NSI, whom together I refer to as the "Navient Defendants," have filed a motion for summary judgment (ECF No. 102), and Progressive has filed a separate motion for summary judgment (ECF No. 95).  In both motions, the defendants seek summary judgment on all counts.  For the reasons explained below, I grant in part and deny in part both motions.[1]

## I.   Facts

### A.  Undisputed Facts

---

[1] On October 19, 2015, this Court entered default judgment against Defendant Aisha Babilonia for $805,903.14.  (ECF No. 88.)

The following facts are undisputed according to the parties' Local Rule 56(a) statements.[2] Charles Hudson and Aleeshia Bailey Hudson live in Windsor, Connecticut. (Bailey Hudson Dep., Pls.' Mem. Opp. Ex. 5 at 27.) They do not own or rent property in Brooklyn, New York. (C. Hudson Dep., Pls.' MSJ Mem. Opp. Ex. 4, at 19.) They carry their own cell phones and do not answer each other's phone. (*Id.* at 44.)

Between April 6 and 10, 2012, Defendant Aisha Babilonia completed an online application for a "Smart Option Student Loan" in the amount of $15,000 with NSI.[3] (Correspondence History, Austin Aff. Ex. A, ECF No. 102-3, at NAV00047–62.) The application listed Mr. Hudson as a cosigner. (*See* Austin Aff. Ex B., ECF No. 102-3, at 42.) After receiving the application, NSI obtained Mr. Hudson's credit report on April 6, 2012. (Correspondence History, Pls.' MSJ Opp. Ex. 1, at NAV000074.) NSI approved and disbursed $15,000 to Babilonia on June 5, 2012. (Austin Aff. ¶¶ 15, 23.)

### 1.  NSI Contacts Mr. Hudson Regarding the Babilonia Loan

In December 2013, the Babilonia loan was delinquent. (*Id.* at ¶ 25.) In an effort to obtain payment on the loan, NSI again obtained Mr. Hudson's credit report on January 2, 2014. (*Id.* at ¶ 26.) An NSI representative named Kenn also called Mr. Hudson on January 8, 2014. (*Id.* at ¶ 22.) The following conversation ensued:

Mr. Hudson:    This is Charles.

---

[2] On June 1, 2016, the Navient Defendants filed a Motion to Strike (ECF No. 121), in which they argue that many of the statements of fact asserted in Plaintiffs' Local Rule 56(a)(2) Statement should be stricken because they lack adequate support in the record. "Such motions are disfavored." *McKinney v. Dzurenda*, No. 3:10-cv-880 (AVC), 2013 WL 1296468, at *1 (D. Conn. March 27, 2013); *see also* Wright & Miller, Fed. Practice & Procedure § 1380 ("[M]otions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently granted." (footnote omitted)). The motion is hereby denied. Nonetheless, I address the arguments asserted in that motion, as well as Plaintiffs' response (ECF No. 122), within my discussion of the record.

[3] At the time, NSI operated under the trade name "Salle Mae, Inc." For the purpose of consistency only, I refer to it as NSI, its current name, in this ruling.

| | |
|---|---|
| Kenn: | This is Charles Hudson? |
| Mr. Hudson: | Yes. |
| Kenn: | Hi, sir, my name is Kenn.  I was trying to contact you.  I'm actually an account manager, I'm calling for Sallie Mae.  This call may be recorded for quality assurance purposes. |
| | You're a cosigner with Aisha, right? |
| Mr. Hudson: | Yeah. |
| . . . | |
| Kenn: | Okay.  Thank you, sir.  I do have a mailing address 1436 Park Place; is that accurate? |
| Mr. Hudson: | Say that again, I'm sorry. . . . |
| Kenn: | I had a mailing address 1436 Park Place?  Is that a correct mailing address? |
| Mr. Hudson: | 436 Park Place in what town? |
| Kenn: | 1436 Park Place in Booklyn. |
| Mr. Hudson: | Oh, okay, yeah. |
| . . . | |
| Kenn: | And the reason again for the call is that we do have a student loan, unfortunately is it in our high risk unit right now, it's been behind a few months.  To bring that completely current we do currently have a present amount of 1,473.56.  Did you want to bring that current this month? |
| Mr. Hudson: | Okay. Hold on one second. |
| Kenn: | Sure. |
| Mr. Hudson: | I've got to take my ear piece off, because I'm on the road.  Did you |

| | |
|---|---|
| | sp[eak] to Al[eeshi]a,[4] because she's going to take care of that. |
| Kenn: | Well, that's what I had assumed since she is the principal borrower on the account, but the last time we had contact with her was back in August.  She's kind of let the account here linger into delinquency, and at this point if we can't get any arrangement on the account, they're looking at a possible litigation on the account here. |
| Mr. Hudson: | Okay. |
| Kenn: | The last time we spoke to her she said she was unemployed.  I don't know what her status is right now, but that was in August. |
| Mr. Hudson: | Yes, yes, she is.  Let me contact her and see if I can get in touch wit her here, because she handled that.  Right now I'm on the road. |
| . . . | |
| Kenn: | Has she updated the status with you here?  Has she spoken to you about this at all? |
| Mr. Hudson: | No, she hasn't spoken to me about it. |

(January 8, 2014 Call Tr., Austin Aff. Ex. I, ECF No. 102-4, at 29–31; *see also* Austin Aff. Ex. H (audio recording).)

The same day, Ms. Hudson called NSI, and informed Kenn that her husband had not, in fact, cosigned any student loan.  (Bailey Hudson Dep., Navient MSJ Ex. 3, ECF No. 102-7, at 7–8.)  Mr. Hudson called Kenn on January 13, 2014, and confirmed that he had never cosigned a student loan.  (January 13, 2014 Call Tr., ECF No. 56-2.)  During that call, Mr. Hudson also informed Kenn that 1436 Park Place was not his address, provided Kenn with his Windsor, Connecticut address, and told Kenn that the Connecticut address NSI had in its file was his

---

[4] Aleeshia Bailey Hudson, who is also a plaintiff, is Mr. Hudson's wife.  A reasonable juror could find from the audio recording of the call, which the Navient Defendants have submitted (Austin Aff. Ex. H), that Mr. Hudson said "Aleeshia," not "Aisha."

mother's address.  (*Id.* at 2–4.)  Mr. Hudson also told Kenn that he did not know any Aisha

Babilonia, and that when they spoke on January 8, the only reason he suggested that he knew of

the loan was that he thought Kenn was referring to his wife, Aleeshia.  (*Id.* at 4.)  Kenn then gave

Mr. Hudson the following instructions:

> What you want to do to proceed further before this month ends, because the
> account here is going to roll into default.  Unfortunately we do not have all of
> your information, so it is going to affect your credit.  What you want to try to do
> right away is go to the nearest police department and file charges on this, because
> what I'll do is I can put it in as fraud, and when the fraud department calls you to
> ask you if you signed for the loan and tell them no, they're going to look for a
> police report.  So you want to try to file charges against this person because if you
> don't know who this is, then your information is here on the account along with
> your signatures regarding this loan.

(*Id.* at 4–5.)  Mr. Hudson asked Kenn what phone number was provided with the loan

application, and Kenn responded with a phone number that Mr. Hudson stated he did not

recognize.  (*Id.* at 5.)  Mr. Hudson also asked how NSI found Mr. Hudson's actual phone

number, to which Kenn responded, "this number here [referring to Mr. Hudson's cell phone

number], I actually had to search to find this number, this wasn't even on the account.  That

other number [that Mr. Hudson did not recognize] was on the account . . ."  (*Id.* at 5.)  Kenn

mentioned two other numbers; the first of which Mr. Hudson did not recognize, but the second of

which Mr. Hudson stated was his residential landline number.  (*Id.* at 5–6.)  Kenn told Mr.

Hudson that he would send him paperwork to complete, and stated, "I'm going to document this

as fraud, so our fraud department may get in contact with you regarding this information. . . .

They'll get in contact with you, and they'll let you know what you need to do from there . . ."

(*Id.* at 7.)[5]

---

[5] The Navient Defendants assert that Kenn then "instructed M[s]. Hudson to have Mr. Hudson contact
NSI's Fraud Department immediately" (Navient SOF ¶ 25), citing Ms. Hudson's deposition.  But the
statements in the cited portion of the deposition make no mention of anyone from NSI instructing Ms.

On February 7, 2014, NSI's fraud investigation department mailed Mr. Hudson a letter instructing him to complete and sign an "Identity Theft Affidavit," which was attached.  (Feb. 7, 2014 Letter, Austin Aff. Ex. J.)  The letter further instructed Mr. Hudson to have the affidavit notarized, and "return it to us along with the required documents, as indicated in the Instructions for Completing the Identity Theft Affidavit."  (*Id.*)  Finally, it stated, "We'll keep this file active for thirty (30) days from the date of this letter," and that "You may want to place a fraud alert on your credit file."  (*Id.*)

### 2.  NSI's Investigation of Mr. Hudson's Fraud Claim

NSI did not receive a response letter from Mr. Hudson letter within the 30-day window set out in the February 7, 2014 Letter.  (Austin Aff. ¶ 36.)  According to NSI's correspondence history, an NSI representative spoke with Mr. Hudson on the phone on March 7, 2014, and during that conversation, Mr. Hudson informed the representative that he had submitted a police report and provided a case number.  (Pls.' MSJ Opp. Ex. 1, at NAV 238.)  The NSI representative's notes from that call read, "cos [Mr. Hudson] . . . sd [sic] he never heard of the borrower… doesn't [sic] look like the cos is telling the truth abt [sic] fraud--looks he is trying to get out of his responsibility."  (*Id.*)

On April 5, 2014, NSI sent Mr. Hudson another letter stating that the Babilonia loan was "seriously past due and in jeopardy of default."  (April 5, 2014 Letter, Austin Aff. Ex. K.)  On April 28, 2014, NSI received a letter from Gregory Osakwe, the Hudsons' attorney, which stated,

> Please be advised that this office represents Charles Hudson.  We are in receipt of your letter dated April 10, 2014 [sic] demanding payment from our client . . . .  Our client denies that he ever cosigned for this student loan.  His identity was used without his knowledge or consent to obtain this loan. . . .  We have filed a

---

Hudson to tell Mr. Hudson to call the Fraud Department.  (*See* Bailey Hudson Dep. at 81–84.)  Rather, in that portion, Ms. Hudson agrees that she spoke with Kenn and informed him that that she did not have a student loan with NSI.  (*Id.* at 82.)

report with the Windsor, Connecticut Police and the case number is 2014-08190. . . .

Please forward all future correspondences to this office.  Do not attempt to contact our client again.

(April 24, 2014 Letter, Austin Aff. Ex. L.)  Attached to the letter were two pages from the Identity Theft Affidavit, the first labeled "How the Fraud Occurred," in which the following statements were checked: "I did not authorize anyone to use my name or personal information to seek the money, credit, or loans described in this report," "I did not sign any applications, loan notes, credit agreements or loan checks in connection with the fraudulent loan(s)," "I did not receive any benefit or money as a result of the events described in this report," "I do NOT know who used my information or identification to get money, credit, or loans without my knowledge or authorization," "I am . . . willing to assist in the prosecution of the person(s) who committed this fraud," and "I am . . . authorizing the release of this information to law enforcement and other 3rd parties where applicable, for the purpose of assisting them in the investigation and/or prosecution of the person(s) who committed this fraud." (*Id.* at 3.)  The second page was a "Signature Statement," in which Charles Hudson's signature appears under a statement affirming that the information in the affidavit is true and correct.  (*Id.* at 5.)  A notary stamp and attestation appears at the bottom of the page.  (*Id.*)  In his affidavit, James M. Austin, Senior Customer Advocate at Navient, asserts that this information was incomplete because it was "missing pages, contained no police report, and lacked pertinent information." (Austin Aff. ¶ 37.)  Austin fails to describe, however, which pages were missing and why Attorney Osakwe's failure to include that information was material to NSI's effort to resolve the fraud claim.[6]

---

[6] Based on the copy of Osakwe's "incomplete" identity theft affidavit that NSI later returned to Osakwe (discussed below), it appears that the "missing information" consists of a copy of Mr. Hudson's photo identification and Social Security Card, a copy of the police report, and the Babilonia loan account

On May 11, 2014, NSI again requested Mr. Hudson's credit report.  (Austin Aff. ¶ 50.)
On May 12, an NSI fraud investigator spoke with Attorney Osakwe and informed him that the
affidavit was incomplete; Attorney Osakwe requested that NSI send him another Identity Theft
Affidavit.  (Austin Aff. ¶ 38.)  On May 12, 2014, NSI sent Attorney Osakwe and Mr. Hudson the
same letter it sent Mr. Hudson on February 7, attaching what appears to be a copy of the identity
theft affidavit that Attorney Osakwe sent NSI in April.  (May 12, 2014 Letter, Austin Aff. Ex.
M.)  On July 17, 2014, Attorney Osakwe returned the identity theft affidavit without adding any
information.  (July 17, 2014 Letter, Austin Aff. Ex. N.)  He did, however, attach a copy of an
"incident report" from the Windsor Police Department, dated February 25, 2014, which detailed
Mr. Hudson's report of an identity theft.  (*Id.*)  Again, Austin asserts that the affidavit submitted
by Attorney Osakwe was incomplete, but fails to describe what information is missing and how
any missing information was material to its fraud investigation.  (Austin Aff. ¶ 40.)  Soon after,
NSI commenced a fraud investigation.  (*Id.*)

NSI "followed up" with Attorney Osakwe twice in an attempt to obtain further
information pertinent to the fraud investigation, but Attorney Osakwe did not respond except by
threatening to sue NSI.  (Austin Aff. ¶ 41.)[7]  In investigating Mr. Hudson's fraud claim, NSI

---

number, loan number, type of loan, the date the loan was disbursed, and the loan amount.  (*See* May 12,
2014 Letter, Austin Aff. Ex. M.)  Again, NSI does not explain why the absence of this information (some
of which NSI already had) prevented it from investigating Mr. Hudson's claim that the loan was
fraudulent.

[7] On May 24, 2016, this Court entered an order noting that Plaintiffs had failed to comply with the
requirements of Local Rule 56(a)(2) by responding to the defendants' factual assertions in their Local
Rule 56(a)(1) Statement with statements that "Plaintiffs do not have sufficient information to admit or
deny."  (ECF No. 118.)  In that order, the Court provided Plaintiffs with the opportunity to correct their
Local Rule 56(a)(2) statement by either admitting or denying each of the defendants' assertions of fact.
The order noted that, if Plaintiffs failed to do so, the Court would consider each fact not expressly
admitted or denied to be admitted.  Plaintiffs filed a corrected Local Rule 56(a)(2) Statement.
Nonetheless, in response to this particular assertion of fact, Plaintiffs failed to admit or deny, stating
instead, "Plaintiffs do not have sufficient information to admit or deny."  (Pls.' SOF (Navient), ECF No.
119, at ¶ 35.)  As a result, I consider this fact admitted.

contacted the Windsor Police Department to receive an update on the Department's investigation. (Austin Aff. ¶ 42.)[8]  At some point before early October 2014, NSI completed its fraud investigation and concluded that there was insufficient evidence to credit Mr. Hudson's claim that he had not signed the Babilonia loan. (*See* Austin Aff. ¶ 44.)[9]

At her deposition, Ms. Hudson could not remember any calls from NSI that were made to her cell phone during the time NSI serviced the Babilonia loan. (Bailey Hudson Dep. at 78.) Further, neither Plaintiff could state whether NSI made calls to their cell phones using an auto-dialing system or using an artificial or prerecorded voice. (*Id.* at 166 ("Q: [N]either you, nor [Mr. Hudson] could say that it was Sallie Mae [that made calls with pre-recorded voices]?  A: No, I couldn't.  And [Mr. Hudson] couldn't say that to you, either?  A: No."); C. Hudson Dep. at 192-93 ("Q: Did you ever receive any prerecorded calls?  A: No.").)

### 3.  Plaintiffs' Credit Agency Dispute

On September 26, 2014, Mr. Hudson sent a letter to the three major credit reporting agencies ("CRAs"), in which he disputed the Babilonia loan and requested that it be removed from his report. (Credit Report Dispute Letters, ECF No. 113-10.)  NSI received automated consumer dispute verification forms ("ACDVs") on October 7, 9, and 13, 2014, from the CRAs. (Austin Aff. Ex. O.)  NSI's protocol for responding to ACDVs includes reviewing the ACDV,

---

[8] Plaintiffs failed to admit or deny this fact in their Local Rule 56(a)(2) Statement.  (Pls.' SOF (Navient) ¶ 37.)  For the same reasons set forth in the preceding footnote, I consider it admitted.

[9] While Austin asserts that NSI reached this conclusion in November 2014 (*see* Austin Aff. ¶ 44), this contradicts other information in his affidavit.  As discussed further below, in early October 2014, NSI received several credit dispute notices regarding the Babilonia loan from the credit reporting agencies. According to NSI, at that time it had already completed its internal investigation into Mr. Hudson's fraud claim, and on October 31, 2014, it wrote to Mr. Hudson that it had concluded that the information it had provided to the CRAs was accurate.  (*See* Austin Aff. ¶¶ 46, 49.)  Thus, it appears that NSI completed its investigation and reached its decision to reject Mr. Hudson's fraud claim at some point before receiving the dispute notices in early October 2014.

validating the accuracy of the information provided by NSI to the agency, and if the ACDV includes a claim of identity theft, taking "additional measures to investigate the matter as appropriate." (Austin Aff. ¶ 47–48.) In accordance with that protocol, NSI reviewed its documents relating to the Babilonia loan and noted that it had obtained no new information since it previously concluded that the loan was not fraudulently obtained. (Austin Aff. ¶ 48.)[10]

On October 31, 2014, NSI sent Mr. Hudson a letter stating that it had received ACDVs indicating that he was disputing the Babilonia loan, but that NSI had "performed an investigation and concluded that the information [NSI] provided regarding this loan to the consumer reporting agencies is valid." (October 31, 2014 Letter, Austin Aff. Ex. P.) It instructed Mr. Hudson, "[i]f you still believe that . . . the loan is a result of identity theft, please call our Fraud Department at the number below. Otherwise, you'll continue to be responsible for repayment of the debt and we may continue to report the information to the consumer reporting agencies." (*Id.*)

### 4. Progressive's Efforts to Collect on the Babilonia Loan

On August 24, 2014, NSI forwarded the Babilonia loan account to Progressive for debt collection. (Gaffney Aff., ECF No. 100, at ¶ 3.) The account file NSI provided to Progressive, however, did not indicate that Mr. Hudson had disputed the loan. (*Id.* at ¶ 4; Gaffney Aff. Ex. A.) As a result, prior to beginning its collection efforts, Progressive was not aware of any facts suggesting that Mr. Hudson had disputed the loan with NSI. (Gaffney Aff. ¶ 5.)[11] Progressive obtained Mr. Hudson's credit report on August 25 and 27, 2014. (*Id.* at ¶ 6; Experian Report,

---

[10] Again, Plaintiffs deny that NSI validated the accuracy of the Babilonia loan. (*Id.* at ¶ 46.) In support of their denial, they cite Paragraph 47 of their Local Rule 56(a)(2) Statement, which asserts that NSI made only a "cursory review." This denial is not responsive to NSI's factual assertion: whether or not NSI's investigation was adequate does not impact whether NSI actually reviewed its documents and came to the conclusion that it had received no additional information.

[11] I consider this fact admitted because Plaintiffs failed to admit or deny it. (Pls.' SOF (Progressive), ECF No. 120, at ¶ 5 ("Plaintiffs do not have sufficient information to admit or deny.").)

ECF No. 58-8, at 11–12.)  It did not obtain Ms. Hudson's credit report.  (*Id.*)  Progressive did not

furnish any information to any CRA about Mr. or Ms. Hudson.  (*Id.* at ¶ 7.)

 Progressive made one phone call to Plaintiffs on August 27, 2014, when a Progressive

representative named Jennifer Cialkowski called the Hudson's home landline and spoke to Ms.

Hudson.  (Pls.' MSJ Opp. Ex. 7; C. Hudson Dep., ECF No. 101-1, at 243–44 (conceding that he

never spoke to Progressive), 247 (confirming the phone number called by Progressive on August

27, 2014, was the Hudsons' landline), 254 (conceding that he cannot produce any messages

received from Progressive); Bailey Hudson Dep., ECF No. 101-2, at 203 (conceding that she

cannot dispute that Progressive made only one call to Plaintiffs).)  The following conversation

ensued:

| | |
|---|---|
| Cialkowski: | Hello.  Calls are monitored and recorded.  This is Jennifer Cialkowski.  Can I speak with Aisha Babilonia or Charles Hudson? |
| Ms. Hudson: | Aisha Babilonia does not live here.  Charles Hudson does.  I'm his wife.  The account that you're calling about, the attorney has already sent out all of the information to you guys, and I also gave you guys information not to call us.  Any correspondence you have, you need to call our attorney.  I will give you his number. |
| Cialkowski: | Ok, ma'am.  What is the attorney for, so that I know? |
| Ms. Hudson: | Because the information that was used, we have nothing to do with it.  It is fraudulent.  We went to the police station and filed a police report.  All the information and all of that was done and we sent it to you guys. |
| Cialkowski: | Alright.  What is your attorney's name? |
| Ms. Hudson: | It is Gregory and the phone number is . . . .  The police report and all the information for the fraudulent charges were sent to you guys.  I don't know why you're still calling us.  It was also noted not to call us.  Call our attorney.  Because your fraud department was dealing with this account, so I don't know why the two aren't linked up and why we're still getting calls. |
| Cialkowski: | Ok.  Now let me ask you this, who is Aisha? |

| Ms. Hudson: | We do not know who that person is. |
| Cialkowski: | Ok.  I'm going to get this taken care of. |
| Ms. Hudson: | Yes.  You guys don't link up with your fraud department? |
| Cialkowski: | I'm really not allowed to get into any information on this. |
| Ms. Hudson: | No, you don't have to give me any information, but the proper paperwork was sent to your fraud department.  Everything that they required, and also the collection department was noted not to call us, call our attorney. |
| Cialkowski: | Ok.  Can I ask you a question?  What is the fraud in reference to? |
| Ms. Hudson: | Well the person used Charles Hudson's information to acquire a loan. |
| Cialkowski: | Ok.  I'm going to update this and I will get it taken care of. . . . |

(Pls.' MSJ Opp. Ex. 7.)  Progressive made no calls to either of the Plaintiffs' cell phones.

(Gaffney Aff. ¶ 9.)

Progressive also sent two letters to Mr. Hudson.  The first, dated August 26, 2014, provided notice that the Babilonia account had been transferred to Progressive, and, "[u]nless you notify this office within 30 days after receiving this notice that you dispute the validity of this debt . . . this office will assume the debt is valid."  (August 26, 2014 Letter, Gaffney Aff. Ex. C, ECF No. 100-3, at 2–3.)  The second letter, dated September 24, 2014, stated that Progressive, "working in conjunction with our client, has received permission to offer" a modified loan, and concluding, "Please do not delay.  We need your cooperation and would like to help you satisfy this long overdue account."  (September 24, 2014 Letter, Gaffney Aff. Ex. C, at 4–5.)

### 5.  Plaintiffs Bring Suit

On November 4, 2014, Plaintiffs brought this lawsuit against Babilonia, SLM Corp. (which has merged into Navient Corp.), Sallie Mae, Inc. (now NSI), Sallie Mae Bank, and

Progressive.  (ECF No. 1.)  On April 9, 2015, Plaintiffs filed a motion for default judgment against Babilonia, who had not appeared.  (ECF No. 58.)  In an affidavit supporting that motion, Mr. Hudson stated he and Ms. Hudson had applied for a mortgage modification through a company named Reid Enterprise, Inc., which is owned by John Rondell, a close family friend. (C. Hudson Aff., ECF No. 58-3, at ¶ 8.)  Reid Enterprise's address is 1436 Park Place, Brooklyn, New York – the same address listed in NSI's records relating to the Babilonia loan.  (*Id.*) Plaintiffs had provided Rondell with their drivers' licenses, social security cards, and pay stubs when they applied for the mortgage modification.  (Bailey Hudson Dep. at 74.)  In the same affidavit, Mr. Hudson stated that he had filed a police report with the Windsor Police Department on April 4, 2014, after he discovered that Rondell had "misused" his personal information "in an unrelated transaction."  (C. Hudson Aff. ¶ 20.)  Plaintiffs had not mentioned Rondell – or the fact that Rondell had access to their personal identifying information – to NSI before Mr. Hudson's statement was submitted to the Court on April 9, 2015.[12]

### 6.  Navient Corp. and Sallie Mae Bank's Involvement

The Navient Defendants assert that neither Navient Corp. nor Sallie Mae Bank engage in loan servicing and have never interacted with Plaintiffs.  (Navient Defs.' SOF ¶¶ 1, 3.)  With respect to Navient Corp., Plaintiffs assert that, according to its 10-Q filing with the Securities and Exchange Commission, Navient Corp. is a "loan management, servicing and asset recovery company."  (Pls.' SOF ¶ 1.)  This response does not speak to the crucial portion of the Navient Defendants' assertion, i.e., that Navient Corp. never engaged in any servicing operations with

---

[12] Plaintiffs deny that they *intentionally* omitted any mention of Mr. Rondell, and explain that they did not inform NSI of the "unrelated incident" with Rondell because that incident did not cause Plaintiffs any injury and they did not know of it "until a later time."  (Pls.' SOF (Navient) ¶¶ 50, 55.)  Plaintiffs do not appear to dispute, however, that they did not mention Rondell to NSI until they moved for default judgment against Babilonia.

13

respect to Plaintiffs or the Babilonia loan.  As for Sallie Mae Bank, Plaintiffs "admit that they do not have any relationship with Sallie Mae Bank[, but] deny the remainder" of the Navient Defendants' assertion, i.e., that Sallie Mae Bank had no interaction with Plaintiffs.  In denying "the remainder" of the assertion, Plaintiffs cite the transcript of the January 8 and 13, 2014, calls between Kenn and Mr. Hudson, a portion of Mr. Hudson's deposition in which he discussed those phone conversations (C. Hudson Dep. at 106–114), and a portion of Ms. Hudson's deposition in which she describes how Mr. Hudson informed her about his January 8 phone conversation and that she called Kenn later the same day (Bailey Hudson Dep. at 80–86).  As with Plaintiffs' response to the argument that Navient Corp. has never performed any loan servicing affecting Plaintiffs, their response does not rebut the Navient Defendants' assertion that Sallie Mae Bank did not engage in any conduct affecting Plaintiffs.

### B.  Disputed Facts

According to the Local Rule 56(a) Statements, the parties dispute the following facts.

### 1.  Babilonia Loan Application and Approval

The Navient Defendants assert that NSI required Mr. Hudson to complete an "online authentication interview" on April 7, 2012, which he passed by answering questions regarding his prior credit history and other personal information.  (Navient SOF ¶ 7.)  Plaintiffs deny this assertion, stating, "Plaintiffs never had any contact with [NSI] until January 2014" (Pls.' SOF (Navient) ¶ 7), and citing portions of both Plaintiffs' depositions in which they state that they had not interacted with NSI until the January 8, 2014.  Plaintiffs' response is only partially responsive to the Navient Defendants' assertion.  While it is clear that they deny that NSI interacted with Mr. Hudson himself on April 7, 2012, they do not deny that NSI interacted with *someone* holding himself out to be Mr. Hudson, and do not cite any evidence to the contrary.

Next, the Navient Defendants contend that an NSI representative spoke with an individual holding himself out to be Mr. Hudson on April 10, 2012, over the telephone, and that during that conversation, the individual verified his name, address, social security number, and date of birth, and confirmed that he was aware of the loan and was willing to cosign.  (*See* Correspondence History at NAV00060.)  They also assert that during the same phone call, the NSI representative confirmed that Mr. Hudson had "two addresses," and preferred to keep his Brooklyn address as the designated mailing address.  (*Id.*)  Again, Plaintiffs deny these assertions by stating only that they did not interact with NSI until January of 2014, yet failing to address the assertion that NSI interacted with someone holding himself out to be Mr. Hudson.  (Pls.' SOF (Navient) ¶ 8–9.)  Plaintiffs cite no evidence in the record rebutting that assertion.

The Navient Defendants also assert that on the same day, Mr. Hudson (or someone holding himself out as Mr. Hudson) electronically signed the Promissory Note.  (Austin Aff. ¶ 16.)  Plaintiffs assert the same partially-responsive objection as above.

Next, the Navient Defendants assert that on April 27 and May 15, 16, and 23, 2012, NSI sent Mr. Hudson letters, addressed to the Park Place address in Brooklyn, requesting that he complete certain documents.  They also assert that on May 21, 2012, NSI received by mail an "executed copy of the required Notice to Cosigner documents, which were executed by Mr. Hudson on or about May 17, 2012."  (Austin Aff. ¶¶ 18–22.)  The record includes a copy of each letter.  (Austin Aff. Exs. C, D, E, F, G.)  Plaintiffs deny these allegations by asserting only that Mr. Hudson did not receive these letters or sign the forms that NSI received on May 21, 2012.  (Pls.' SOF (Navient) ¶¶ 13–16, 19.)  They do not deny, however, that these letters were sent to the Brooklyn address, or that NSI received the completed and signed forms from someone holding himself out to be Mr. Hudson.

### 2.  NSI's Investigation of Mr. Hudson's Fraud Claim

The Navient Defendants assert, and NSI's records show, that after speaking with Kenn on January 13, 2014, Mr. Hudson did not contact NSI's fraud department until February 7, 2014. (Austin Aff. ¶ 33.)  The Navient Defendants also assert that Mr. Hudson still has not provided NSI with a completed Identity Theft Affidavit.  (Austin Aff. ¶ 41.)  Plaintiffs deny this fact, and cite a declaration by Attorney Osakwe, submitted to the Court in connection with the motion for default judgment against Babilonia, in which he states, "After I finally received the police report [from the Windsor Police Department] dated February 25, 2014 for the [NSI] identity theft matter, I then sent both the completed affidavit of fraud and the Windsor Police Report to [NSI] on July 17, 2014 by first class mail and by fax . . ."  (ECF No. 58–7, at ¶ 7.)

With respect to NSI's communication with Plaintiffs, Austin states that any calls made by NSI to Plaintiffs' cell phones were "manually initiated by an agent, and were not placed using an autodialer or a pre-recorded or artificial voice."  (Austin Aff. ¶ 43.)  In denying this assertion, Plaintiffs point to the fact that NSI utilizes a Noble Systems dialing device, which Plaintiffs characterize as an "autodialing device."  (Pls.' SOF (Navient) ¶ 38.)  The Correspondence History indicates multiple calls to Mr. Hudson's cell phone number and one call to Ms. Hudson's cell phone number.  Four entries indicate calls to Mr. Hudson's cell phone number with the word "NOBLE" at the beginning of the entry.  (*Id.* at NAV000630, 637, 642, 645.)  Other notations in the correspondence history state "Passed Noble Phone Number" and listing one of the Plaintiffs' cell phone numbers, followed by an entry stating, "Phoned Co-Borrower @" the same cell phone number.  (*See id*. at NAV000579, 580, 583, 606.)  Two pages also list a series of calls made to Mr. Hudson's cell phone number, each of which states "Preview" under a column labeled "Call Type."  (Pls.' Mem. Opp. Ex. 1 at NAV000658–59.)  According to testimony by Barbara

Hoerner, Chief Compliance Officer at Progressive, Noble Systems "is the manufacturer of our telephone dialing equipment."  (Hoerner Dep., Pls.' MSJ Opp. Ex. 3, at 59.)

### 3.  Progressive's Interactions with Plaintiffs

Progressive asserts that its only call to Plaintiffs, which occurred on August 27, 2014, was the result of a Progressive representative's manually dialing the Plaintiffs' landline phone number.  Plaintiffs respond that the "call was placed through PFS/Progressive auto-dialer system, Noble System."  (Pls.' SOF (Progressive) ¶ 8; *see also id.* at ¶ 9 (denying Progressive's assertion that "it never placed any 'robo' or 'automatic' calls to either plaintiff" and referencing its statement in ¶ 8).)  In support of their claim that the August 27 call was the result of automatic dialing, Plaintiffs cite pages 61 and 62 of Hoerner's deposition.  In that portion, Hoerner explains that the "Noble System records every conversation between a live agent and a voicemail or a live agent and another live person," and that she did not know whether the Noble System dials out automatically because she did not know what type of "campaign" was being run on the Babilonia loan at the time.  (Hoerner Dep. at 61–62.)

## II.  <u>Legal Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted).  In reviewing the record, the Court must "construe the facts in the light most favorable to the non-moving party," *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008), and "resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide," *Aldrich v.*

*Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather [the] response . . . must set forth specific facts demonstrating that there is a genuine issue for trial." *Wright*, 554 F.3d at 266 (internal quotation marks omitted).

## III.   <u>Discussion</u>

Plaintiffs assert the following claims: (1) violation of Connecticut's identity theft statute, Conn. Gen. Stat. § 52-571h, against the Navient Defendants, (2) violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227(b)(1), against the Navient Defendants and Progressive, (3) two counts of violation of the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681b(f) and 1681s-2(b), against the Navient Defendants and Progressive, and (4) various theories of violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*, against the Navient Defendants and Progressive.

### A.  **Abandoned Claims**

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Carone v. Mascolo*, 573 F. Supp. 2d 575, 591 (D. Conn. 2008) (internal quotation marks omitted). In their memoranda, Plaintiffs failed to respond to two sets of arguments raised in the Navient Defendants' and Progressive's summary judgment motions: (1) Ms. Hudson lacks standing to raise any of the claims in the complaint, and (2) Navient Corp. and Sallie Mae Bank engaged in no conduct affecting the Plaintiffs.

Progressive and the Navient Defendants contend that they are entitled to summary judgment with respect to all of Ms. Hudson's claims because she lacks standing. They argue that

she cannot assert any of the claims in the complaint because "her identity was not stolen, her credit was not impacted, and she was not contacted for any debt collection purpose." (Navient Defs.' MSJ Mem. at 4; *see also* Progressive MSJ Mem., ECF No. 96 ("It is undisputed that Progressive did <u>nothing</u> as to her. It did not review her credit report; it did not write to her; it did not leave her any messages; it did not try to collect from her; it did not harm her credit rating; a Progressive representative spoke briefly to her <u>once</u>, but the recorded conversation was short and courteous and she admits that she has no memory of it in any event." (emphasis in original)).) In their opposition memoranda, Plaintiffs do not address these arguments at all. (*See* Navient Defs.' MSJ Reply, ECF No. 115, at 2 (noting Plaintiffs' failure to respond to the argument that Ms. Hudson lacks standing); Progressive MSJ Reply, ECF No. 114, at 9 (same).) As a result, I consider Ms. Hudson's claims abandoned and grant summary judgment in favor of Progressive and the Navient Defendants as to all claims asserted by Ms. Hudson.

The Navient Defendants also argue in their summary judgment memorandum that Mr. Hudson's claims against Navient Corp. (or its prior identity, SLM Corp.) and Sallie Mae Bank lack merit because those defendants did not service the Babilonia loan or engage in any conduct that affected Mr. Hudson. Plaintiffs do not respond to this argument. In any event, no evidence in the record supports a finding that Navient Corp. or Sallie Mae Bank could be liable to Mr. Hudson because the record lacks any evidence of conduct by either Navient Corp. or Sallie Mae Bank. Even if it did, however, I consider Mr. Hudson's claims against those defendants abandoned, and grant summary judgment in favor of Navient Corp. and Sallie Mae Bank as to all counts asserted in the complaint.

The following claims asserted by Mr. Hudson remain: (1) violation of Connecticut's identity theft statute against NSI, (2) violation of the TCPA against NSI and Progressive, (3) two

counts of violation of the FCRA against NSI and Progressive, and (4) various violations of the FDCPA against NSI and Progressive.

### B. Identity Theft (Count One)

Mr. Hudson asserts that NSI is liable to him for violating Connecticut's identity theft statute.  Conn. Gen. Stat. § 52-571h(a) provides a cause of action for "damages resulting from identity theft," permitting "any person aggrieved by an act constituting a violation of" Conn. Gen. Stat. §§ 53a-129a through 53a-129e to bring an action for damages "against the person who committed the violation."  Section 53a-129a(a) states that "[a] person commits identity theft when such person knowingly uses personal identifying information of another person to obtain or attempt to obtain money, credit, goods, services, property or medical information without the consent of such other person."  "[P]ersonal identifying information" is defined as "any name, number or other information that may be used, alone or in conjunction with any other information, to identify a specific individual including, but not limited to, such individual's name, date of birth, . . . [or] Social Security number."  Conn. Gen. Stat. § 53a-129a(b).  Related statutes define various degrees of identity theft – all of which are felonies – depending on the age of the victim and the amount of money obtained.  *See* Conn. Gen. Stat. §§ 53a-129b (identity theft in first degree is class B felony); 53a-129c (identity theft in second degree is class C felony); 53a-129d (identity theft in third degree is class D felony).

NSI asserts that it cannot be held liable under Section 52-571h because no evidence in the record suggests that it used Mr. Hudson's information to "obtain money, credit, goods, services, property or medical information," or that it knowingly used Mr. Hudson's information without his consent.  It argues that the only individual who can be held liable under the identity theft statute is the individual who fraudulently obtained the loan.  Mr. Hudson responds by arguing

that NSI violated the identity theft statute because it used his personal information to obtain "money" when it received interest proceeds as a result of the loan, and that NSI may be liable for negligently using his personal information without his consent.

The critical issue here is whether NSI had the requisite intent under the identity theft statute when it approved the Babilonia loan.  The parties offer differing constructions of Section 53a-129a(a): NSI argues that the "knowing" mental state requirement applies to each element of the provision – including the requirement that the defendant use the victim's personal information "without the consent" of the victim – whereas Mr. Hudson argues that the "without consent" element can be satisfied by a showing of criminal negligence.  He asserts that NSI's failure to ensure that he actually signed the Babilonia loan application amounted to criminal negligence because it was a gross deviation from the standard of care applicable to a reasonable lender in that situation.  *See* Conn. Gen. Stat. § 53a-3(14) (defining criminal negligence as "fail[ing] to perceive a substantial and unjustifiable risk that such a result will occur or that such circumstances exist").

I reject Mr. Hudson's construction of the identity theft statute for multiple reasons.  First, it is not the claim alleged in his complaint, which asserts that NSI "*knew* that . . . Mr. Hudson did not authorize or permit or provide his consent to them to use his personal identifying information to obtain the credit of $15,000 in student loan, in violation of Connecticut criminal statutes C.G.S. § 53a-129a and C.G.S. § 53a-129b (Class B felony)."  (Compl. ¶ 22 (emphasis added).) The complaint plainly articulates a theory of intentional wrongdoing, rather than a theory of negligence, against NSI under Conn. Gen. Stat. §§ 52-571h, 53a-129a, and 53a-129b.

Second, Mr. Hudson's construction of the identity statute does not square with its plain language.  *See* Conn. Gen. Stat. § 1-2z ("The meaning of a statute shall, in the first instance, be

ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.").  Nothing in the statutory definition of identity theft in Section 53a-129a betrays a suggestion that the General Assembly intended to impose a negligence standard.  None of the words or phrases commonly associated with such a standard – such as "reasonable," "should have known," or "negligently" – appears in the statute.  To the contrary, a word more commonly associated with criminal intent – "knowingly" – was the modifier chosen by the General Assembly.  *Cf. United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) ("Although not stated in the Hobbs Act itself, criminal intent – acting 'knowingly or willingly' – is an implied and necessary element that the government must prove for a Hobbs Act conviction.").

Mr. Hudson argues that "knowingly" modifies only the word "use," and points out that the Connecticut standard jury instructions for identity theft mention "knowingly" only in defining the "use" element, and not in defining the "without consent" element.  *See* Connecticut Judicial Branch Criminal Jury Instructions, *available at* http://jud.ct.gov/ji/criminal/Criminal.pdf, at § 10.3-1 (last visited June 14, 2016).  The difficulty with this argument is two-fold.  First, it would accord little meaning to the word "knowingly" and, as a practical matter, would render it superfluous.  It is unlikely that a lender, business, or other person would make accidental or other unknowing use of a person's identifying information to obtain money, credit, goods, or medical information because, in the modern world, such transactions typically involve the exchange of multiple items of personal identifying information for security purposes and to avoid the prospect that important commercial and other transactions might proceed on the basis of

22

typographical errors or other slip-ups.  Adding the word "knowingly" to the statute would have little effect because nearly all "uses" of personal identifying information in the types of transactions contemplated by the statute would already be "knowing" in the limited sense urged by Mr. Hudson, i.e., that the defendant intended to enter the information into its computer system and did not do so accidentally.  Second, Mr. Hudson's narrow interpretation of the term "knowingly" would impose criminal penalties using a strict liability standard, rather than a negligence standard (for which, as noted, there is no supporting language), on the non-accidental use of a person's identifying information by any business, hospital, or other person whenever the use was without the person's consent, even when the user had taken reasonable precautions against identity theft or otherwise reasonably believed that the use was permitted.  It is unlikely the General Assembly intended to punish as felons those who unwittingly use stolen information. *See State v. Drupals*, 306 Conn. 149, 165 (2012) ("We must interpret the statute so that it does not lead to absurd or unworkable results.").

Other language in the statute confirms that, contrary to Mr. Hudson's argument, it contemplates the "use" of a person's identifying information *known* to be without the consent of that person.  Section 53a-129a defines "identity *theft*," and its related provisions are intended to punish such theft.  *See* Conn. Gen. Stat. §§ 53a-129a ("Identity theft defined"); 53a-129b ("Identity theft in the first degree: Class B felony"); 53a-129c ("Identity theft in the second degree: Class C felony"); 53a-129d ("Identity theft in the third degree: Class D felony").  The Connecticut General Statutes consistently use the term "theft" to refer to the taking of another's property while knowing that the taking is without the consent of the other.  For example, a provision authorizing "[t]reble damages for theft" states, "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble

23

damages."  Conn. Gen. Stat. § 52-564.  Construing this provision, Connecticut courts have held

that, "[s]tatutory theft under § 52-564 is synonymous with larceny," *Hi-Ho Tower, Inc. v. Com-*

*Tronics, Inc.*, 255 Conn. 20, 44 (2000), which Connecticut statutes define as "when, with intent

to deprive another of property or to appropriate the same to himself or a third person, [a person]

wrongfully takes, obtains or withholds such property from an owner."  Conn. Gen. Stat. § 53a-

119; *see also State v. Cooper*, 5 Day 250, 255, 1812 WL 124, at *4 (Conn. 1812) ("The common

law definition of theft is, the feloniously taking and carrying away the personal goods of another,

with intent to steal."); Black's Law Dictionary 1705 (10th ed. 2014) (defining "theft" as "The

wrongful taking and removing of another's personal property with the intent of depriving the true

owner of it; larceny," and "Broadly, any act or instance of stealing, including larceny, burglary,

embezzlement, and false pretenses" (emphasis added)).  Other uses of the term "theft" in the

Connecticut General Statutes corroborate this definition.  *See, e.g.*, Conn. Gen. Stat. §§ 53-

142k(a)(b) (defining "organized retail theft" as "for financial gain and in conjunction with one or

more other persons, commit[ting] larceny by shoplifting" (emphasis added)); 53a-128c(a) ("Any

person who takes a credit card from the person, possession, custody or control of another without

the consent of the cardholder or of the issuer or who, with knowledge that it has been so taken,

receives the credit card with intent to use it or to sell it, . . . is guilty of credit card theft . . ."

(emphasis added)).  In short, well-established understandings of the term "theft" in Connecticut

law confirm that identity theft within the meaning of 53a-129a occurs only when the user of

another person's identifying information knows that his or her use is without the other person's

consent.[13]

---

[13] To the extent the statute is ambiguous, both the rule of lenity and the legislative history also support
interpreting the statute to apply only to uses of a person's identifying information known to be without the
consent of that person.  *Drupals*, 306 Conn. at 160 ("[W]hen the statute being construed is a criminal
statute, it must be construed strictly against the state and in favor of the accused. . . .  [C]riminal statutes

Finally, Mr. Hudson offers no authority in support of his construction of the identity theft statute other than to point out that Connecticut has recognized the concept of criminal negligence in certain manslaughter cases.  (*See* Pls.' Mem. Opp. (Navient) at 14–15 (citing Conn. Gen. Stat. § 53a-3(14) (defining criminal negligence) and manslaughter cases discussing the concept of criminal negligence).)  Those cases involve statutes that use language expressly making negligence the pertinent standard.  *See, e.g.*, *State v. Bunkley*, 202 Conn. 629, 639 (1987) ("The defendant readily admits that our statutes relating to vehicular homicide are applicable if death occurs through criminal negligence or simply through negligence in the operation of a motor vehicle.  *See* General Statutes §§ 53a-57 ['A person is guilty of misconduct with a motor vehicle when, with criminal negligence in the operation of a motor vehicle, he causes the death of another person.'], 14-222a ['(a) Except as provided in subsection (b) of this section, any person who, in consequence of the negligent operation of a motor vehicle, causes the death of another person shall be fined not more than one thousand dollars or imprisoned not more than six months or both.'].").  As shown, however, there is no such language in the identity theft statute.[14]

---

are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant." (citation and internal quotation marks omitted)).  During the General Assembly debates on the 2009 amendment to the identity theft statutes, which added the word "knowingly" to Section 53a-129a(a), legislators referred to identity theft as the fraudulent use of an individual's personal identifying information.  *See, e.g.*, Conn. Gen. Assem., Tr. for May 27, 2009, at 3993 (statement of Sen. Witkos) ("I think it goes a long way in protecting our senior population, because it appears that they're most likely to ones to be duped by those who would try to steal someone's identity fraudulently.").  The legislature was focused on those it regarded as criminals, and sought to make it "easier for law enforcement to take part and try to capture those criminals and help these people put their lives back together" (*id.* at 238).  There is no suggestion that the legislators sought to punish those who unwittingly use stolen personal identifying information.

[14] Although the Court could find few Connecticut cases interpreting the identity theft statutes, a Connecticut Appellate Court decision includes some language suggesting that the defendant's use of the victim's personal identifying information must be known to be without the victim's consent.  *State v. Bozelko*, 119 Conn. App. 483, 508 (2010) ("[Section 53a-129a] punishes defined acts, in this case, the acts of obtaining the credit card number and of  using that credit card number, without the cardholder's permission.").  The decision from this Court cited by NSI – *Bentley v. Greensky Trade Credit, LLC*, No. 3:14-cv-1157 (VAB), 2015 WL 9581730 (D. Conn. Dec. 30, 2015) – does not provide clear support for

In sum, I conclude that the Connecticut Supreme Court would read Section 53a-129a(a) to require that, in order to be criminally liable, a defendant know that the victim of identity theft had not consented to the use of his or her personal identifying information. Using this interpretation, I find that there is no evidence in the record that would permit a reasonable jury to find that NSI knew Mr. Hudson had not signed the Babilonia loan application when it was approved. Thus, no reasonable jury could find NSI liable under Section 52-571h.[15] I grant summary judgment in favor of NSI as to Count One.

### C. TCPA Claims (Count Two)

Mr. Hudson claims that NSI and Progressive violated the TCPA by making calls to his cell phone[16] using autodialing equipment and artificial and prerecorded voices. Both NSI and

---

either NSI's or Hudson's position. There, the court found that adding an identity theft claim would be futile because the plaintiff "failed to plead facts regarding the bank's state of mind. . . . [B]ased on the facts currently alleged, the bank *had no reason to know* that [plaintiff's] personal information and signature were not freely and properly provided on the [loan] application." *Id.* at *8 (emphasis added). That language is as consistent with NSI's interpretation that the statute requires proof of knowledge of lack of consent as it is with Mr. Hudson's interpretation that the statute requires only proof of negligence.

[15] NSI also argues that Plaintiffs' identity theft claim is preempted by the FCRA. Because I find that NSI did not violate Section 53a-129a(a), I need not address this argument.

[16] In his opposition memoranda, Mr. Hudson claims, for the first time, a violation of 47 U.S.C. § 227(b)(1)(B) (prohibiting "initiat[ing] any telephone call to any *residential telephone line* using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party" (emphasis added)). In his complaint, Mr. Hudson alleges a violation of 47 U.S.C. § 227(b)(1)(A) only. (*See* Compl. ¶¶ 27–29.) Because he did not plead a violation of Section 227(b)(1)(B) in his complaint, Mr. Hudson may not raise the issue of whether NSI used an artificial or prerecorded voice to call his landline phone at this stage. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (stating that a party "is not entitled to amend its complaint through statements made in motion papers").

He also asserts, for the first time, that NSI violated the TCPA by calling his mother's landline phone using an ATDS. Not only did Mr. Hudson not plead this allegation, but also there is no evidence that he is the subscriber of his mother's landline or that he answered those calls. Thus, Mr. Hudson lacks standing to assert such a TCPA claim because he was not the "called party" for the calls in question. *See, e.g., Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 504 (S.D.N.Y. 2014) ("[U]nder the TCPA, the 'called party' is the subscriber assigned the cell phone number at the time the allegedly improper calls are made . . .").

Progressive argue that there is no evidence in the record suggesting that they violated the TCPA. The TCPA exposes to civil liability any person in the United States who "make[s] any call . . . using any automatic telephone dialing system [(ATDS)] or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227b(1)(A)(iii). An ATDS is equipment that "has the capacity . . . (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Because no reasonable jury could find that NSI or Progressive called Mr. Hudson's cell phone using an ATDS or a prerecorded or artificial voice, I grant summary judgment in the defendants' favor as to Count Two.

### 1.  NSI

NSI argues that the correspondence history, which Mr. Hudson relies on in making this claim, does not suggest the manner in which those calls were dialed. It also points to the fact that neither Mr. nor Ms. Hudson could say in their depositions whether the calls they received from NSI were autodialed or used artificial or prerecorded voices. Mr. Hudson responds by citing evidence that NSI used a Noble Systems dialing system to make calls to Plaintiffs' cell phones and landline. He cites four entries in the correspondence history that indicate calls from NSI to Mr. Hudson's cell phone with the following information: "NOBLE: AT [time] ON [date] PHONE NUMBER [Mr. Hudson's cell phone number] WAS ATTEMPTED BY 8Z6 AND RESULTED IN AN ANS. MACH. – NML." (Pls.' MSJ Opp. Ex. 1 at NAV000630, 637, 642, 645.) Further, Mr. Hudson points to two pages in the correspondence history that list a series of calls made to Mr. Hudson's cell phone number, each of which states "Preview" under a column labeled "Call Type." (*Id.* at NAV000658–59.)

A reasonable jury could infer from this information that these calls were made using a

Noble dialing system.  The fact that NSI used a Noble dialing system, however, is insufficient to permit Mr. Hudson to survive summary judgment; there also must be evidence in the record that enables a reasonable jury to find that the Noble system used by NSI to call Mr. Hudson was an ATDS.  In response to NSI's argument that no such evidence exists, Mr. Hudson asserts that "Noble System is a provider of autodialing technology," citing a Wikipedia page entitled "Dialer."  *Dialer*, Wikipedia: The Free Encyclopedia, https://en.wikipedia.org/wiki/dialer (last visited June 6, 2016).  Under the heading "Dialing modes," that page states, "Automated dialers *such as those sold by Noble Systems* . . . can place calls using []preview[], []power[], auto dialing, or predicative dialing."  *Id.* (emphasis added).  It also describes "Preview" dialing by stating, "Preview dialing keeps agents from dialing calls manually."  *Id.*  As NSI has pointed out, however, the content of the webpage is inadmissible hearsay.  *See* Fed. R. Civ. P. 56(c)(2).  In addition, the contents of a Wikipedia page are inherently unreliable given the fact that any person may anonymously edit any page at any time.  *See, e.g.*, *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 977 n.19 (C.D. Cal. 2010) ("Wikipedia.com [is] a website that allows virtually anyone to upload an article into what is essentially a free, online encyclopedia.  A review of the Wikipedia website reveals a pervasive, and for our purposes, disturbing series of disclaimers, among them, that . . . Wikipedia articles are [] subject to remarkable oversights and omissions . . . ." (internal quotation marks omitted) (quoting *Campbell ex rel. Campbell v. Sec. of Health & Human Servs.*, 69 Fed. Cl. 775, 781 (2006)); *Fleishman v. Cont'l Cas. Co.*, No. 09 C 00414, 2011 WL 5866264, at *4 (N.D. Ill. Nov. 22, 2011) ("As useful as Wikipedia is as an information source, a Wikipedia entry is not admissible evidence.").

Mr. Hudson cites two cases for the proposition that the technology NSI used to call him violated the TCPA, but neither supports his claim.  First, he cites *Morse v. Allied Interstate, LLC*,

in which the defendant called the plaintiff's cell phone 356 times in an attempt to collect a debt.

65 F. Supp. 3d 407, 408 (M.D. Pa. 2014).  In its decision, the court described at length the

dialing system at issue by reviewing the evidence in the record.  *Id.* at 409 ("Defendant's system

cannot randomly or sequentially generate telephone numbers but the system has the capacity to

store and dial random sequential numbers if provided with a list of such numbers which is

uploaded into a mapping field specifically design[ed] to receive such a list.").  The court ruled

that the dialing system, as demonstrated by the record, was "sufficiently similar to those

contemplated" by the pertinent regulatory definition of an ATDS system.  In the other case cited

by Mr. Hudson, *Davis v. Diversified Consultants, Inc.*, the court found that the dialing system at

issue was an ATDS because the record "clearly establishe[d] that the . . . system has the *capacity*

to store telephone numbers," and qualified as a predictive dialer.  36 F. Supp. 3d 217, 225–26 (D.

Mass. 2014).  Both *Morse* and *Davis* stand for the proposition that the evidence in the record

must support a finding that the dialing system at issue has ATDS capabilities in order for the

plaintiff to survive summary judgment.  Here, the only piece of evidence in the record describing

the type of dialing system NSI used to call Mr. Hudson's cell phone is a document that describes

the call type as "Preview."  This, alone, does not support a reasonable inference that NSI utilized

an ATDS to call Mr. Hudson's cell phone.

Nor is there sufficient evidence in the record to enable a reasonable jury to find that NSI

used an artificial or prerecorded voice when calling Mr. Hudson's cell phone.  Mr. Hudson cites

two portions of the record to support this claim.  First, he cites Ms. Hudson's deposition

testimony, in which she responded to the question "[S]houldn't [Mr. Hudson] have been aware

of the loan then if he was receiving calls?" by stating:

> A lot of times you got those little funny voice things where, you know, we're
> trying to reach you.  When he actually picked the phone up and speak to someone,

> because they are not supposed to be on the phone when they are driving, and if I
> come home and hear one of these things on the home phone, I ignore it because
> it's like if it's important, they will leave a message.

(Bailey Hudson Dep. at 135.) He also cites a later portion of Ms. Hudson's deposition testimony

in which she states that Mr. Hudson "tells me that a funny thing comes in where you hear please

hold, but it's not somebody, but you hear that thing that says please hold." (*Id.* at 166.) Neither

of these statements can be used to support Mr. Hudson's claim that NSI used artificial or

prerecorded statements when calling his cell phone. The second statement is inadmissible

hearsay and does not fall within any of the exceptions set forth in the Federal Rules of Evidence:

Ms. Hudson is testifying to what Mr. Hudson told her regarding the phone calls he received from

NSI, and Mr. Hudson's statements are being offered for truth. *See* Fed. R. Evid. 801, 802; *Lewis*

*v. Town of Waterford*, 239 F.R.D. 57, 60 ("A party cannot rely on inadmissible hearsay in

opposing a motion for summary judgment . . . absent a showing that admissible evidence will be

available at trial." (internal quotation marks omitted)). The statements that Mr. Hudson received

"those little funny voice things," are simply too vague to support a reasonable inference that the

calls were initiated using an artificial or prerecorded voice. Nor could they support a reasonable

inference that the call was even from NSI: Ms. Hudson made this statement while discussing

phone calls the Hudsons received before they were made aware of the Babilonia loan, and her

description of the calls provides no information linking them to NSI. (*See* Bailey Hudson Dep.

at 134–35.) Further, the fact that the message was "funny" and stated "we're trying to reach

you," even construed in the light most favorable to Mr. Hudson, does not tend to prove that these

were artificial or prerecorded voices. Finally, when Mr. Hudson was asked whether he received

any prerecorded calls, he responded "No." (C. Hudson Dep. at 192–93.) In responding to NSI's

contention that the record contains no evidence that it used artificial or prerecorded voices, it was

Mr. Hudson's burden to point to evidence raising a *genuine* dispute as to that fact; a statement that he received a "funny call" fails to do so.

Because no reasonable jury could find that NSI used an ATDS or artificial or prerecorded voices in calling Mr. Hudson, summary judgment is granted in favor of NSI as to Count Two.

### 2. Progressive

Progressive asserts that it made only one call to Mr. Hudson's landline[17] on August 27, 2014, when a Progressive representative briefly spoke with Ms. Hudson.  With respect to calls to landline phone numbers, the TCPA only prohibits the use of artificial or prerecorded voices – it does not prohibit the use of an ATDS.  *See* 47 U.S.C. § 227(b)(1)(B).  Progressive argues that the record contains no evidence that the August 27 phone call was made using an artificial or prerecorded voice.  In response, Mr. Hudson argues that Progressive used a Noble dialing system to make that August 27 call, and as a result, Progressive used an artificial or prerecorded voice. The evidence Mr. Hudson cites in support of this proposition, however, is insufficient to create genuine dispute as to this fact.  First, he cites Hoerner's deposition, in which she states, while reviewing Progressive's call history to Mr. Hudson (Pls.' MSJ Opp. Ex. 10), that "Noble Systems is the manufacturer of our telephone dialing equipment."  (Pls.' MSJ Opp. Ex. 3 at 59.) This does not support the proposition that Progressive initiated a call to Mr. Hudson using an artificial or prerecorded voice.

Further, the transcript of the August 27 call demonstrates that it was the Progressive representative, not an artificial or prerecorded voice, who called the Hudsons' landline and spoke

---

[17] As stated above, Mr. Hudson has not pled a TCPA claim based on calls to his landline, and makes this claim for the first time in his memoranda in response to the defendants' motions for summary judgment. Progressive, however, did not raise this issue.  Because I conclude that, in any event, no evidence supports Mr. Hudson's TCPA claim against Progressive, I address the merits of the TCPA claim against Progressive.

to Ms. Hudson.  (*See* Pls.' MSJ Opp. Ex. 7.)  Mr. Hudson also cites Progressive's call history, which lists a single call to Mr. Hudson's residential landline and bears a "Noble System" logo on the top right corner of the document.  (Pls.' MSJ Opp. Ex. 10.)  Again, the fact that Progressive used Noble Systems technology in calling Mr. Hudson does not itself prove that Progressive used an artificial or prerecorded voice.

There is no evidence in the record that Progressive initiated the August 27, 2014, call to the Hudsons' residential landline – the only call it made to either plaintiff – using an artificial or prerecorded voice.  As a result, I grant summary judgment in favor of Progressive as to Count Two.

### D.  FCRA Claims (Counts Three and Four)

In Count Three, Mr. Hudson claims that NSI and Progressive violated the FCRA by improperly obtaining his credit report from various CRAs in connection with the Babilonia loan, including by using false pretenses.  In Count Four, he claims that NSI and Progressive failed to respond adequately to the dispute notifications they received from the CRAs.  Construing the evidence in the record in the light most favorable to Mr. Hudson, and drawing all reasonable inferences in his favor, I conclude that a reasonable jury could find that NSI and Progressive violated the FCRA by negligently pulling his credit report without a permissible purpose, and that NSI failed to conduct a reasonable investigation after receiving the dispute notice from the CRAs.  No reasonable jury could find, however, that Progressive violated the FCRA by failing to conduct a reasonable investigation because it never received any dispute notification from any CRA.  As a result, I deny NSI's motion as to Counts Three and Four, deny Progressive's motion as to Count Three, and grant Progressive's motion as to Count Four.

### 1.  NSI – Count Three (Obtaining Mr. Hudson's Credit Report)

In Count Three, Mr. Hudson asserts that NSI unlawfully obtained his credit report. The record demonstrates that NSI obtained Mr. Hudson's credit report on April 6, 2012, January 2, 2014, and May 11, 2014. NSI argues that summary judgment should be granted on this count because on each occasion, it obtained Mr. Hudson's credit report for a permissible purpose.

The FCRA makes it unlawful to "obtain a consumer report for any purpose unless . . . the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished" under its provisions. 15 U.S.C. § 1681b(f). NSI argues that it obtained Mr. Hudson's credit report for a "permissible purpose" because on each occasion it was either in the process of extending credit – with respect to the April 6, 2012, credit report – or reviewing or attempting to collect on the Babilonia loan – with respect to the January 2 and May 11, 2014 credit reports – for which it believed Mr. Hudson to be a cosigner. The FCRA authorizes CRAs to furnish a consumer credit report to "a person which [the CRA] has reason to believe . . . intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A). "[T]he credit transaction or review or collection or an account must be one involving the consumer on whom the information is to be furnished." *Weitz v. Wagner*, No. 07-cv-1106 (KAM), 2009 WL 4280284, at *3 (E.D.N.Y. Nov. 24, 2009). Mr. Hudson argues that NSI's actions do not fall under Section 1681b(a)(3)(A) because he was not actually "involved" in the Babilonia loan; rather, his name was fraudulently added as a cosigner.

NSI contends that it cannot be held liable for violating Section 1681b(f) as long as it believed in good faith that Mr. Hudson was a cosigner on the Babilonia loan. It cites *Bickley v. Dish Network*, in which an identity thief used the plaintiff's information in attempting to open a

satellite television account with the defendant.  751 F.3d 724 (6th Cir. 2014).  After receiving the application, the defendant used CRAs to cross-reference the personal information provided by the identity thief; the CRAs reported that they could not match the information with the applicant.  The defendant then contacted the plaintiff to inform him that someone had used his personal information to try to open an account.  The plaintiff brought suit against the defendant under the FCRA, asserting that it had not obtained his credit history for a permissible purpose, to which the defendant responded that it obtained the plaintiff's credit history for a "legitimate business need," another enumerated permissible purpose under the FCRA.  15 U.S.C. § 1681b(a)(3)(F)(i) (authorizing the furnishing of a report when the requester "has a legitimate business need for the information . . . in connection with a business transaction that is initiated by the consumer").  The court affirmed summary judgment to the defendant on the FCRA claim on the ground that it had a legitimate business need for the plaintiff's credit information.  Specifically, the court noted that the defendant obtained the plaintiff's credit history for the purposes of confirming the applicant's identity, and before receiving any indication that the application was fraudulent, the defendant "believed in good faith that Bickley was 'the consumer' . . . [and] that [the defendant's] alleged conduct *conferred a benefit* to Bickley" by ensuring that it was Bickley himself who had filed the application.  *Bickley*, 751 F.3d at 732–33 (emphasis in original).  As a result, the court stated, the defendant could not be held liable under the FCRA.

*Bickley*, however, does not insulate NSI from liability because the FCRA places a more burdensome responsibility on users of credit reports than NSI suggests.  Not only must NSI's belief that Mr. Hudson actually cosigned the Babilonia loan have been in good faith to avoid liability, but it also must have been reasonable.  *See* 15 U.S.C. § 1681o(a) ("Any person who is

*negligent* in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer . . ." (emphasis added)); *Braun*, 14 F. Supp. 3d at 166 ("To state a claim for civil liability based on Section 1681b, a plaintiff must allege both that the defendant used or obtained the plaintiff's credit report for an impermissible purpose, and that the violation was willful or *negligent*." (emphasis added) (collecting cases)).  If a reasonable jury could find that NSI negligently obtained Mr. Hudson's credit report in connection with the Babilonia loan despite the fact that he had not actually cosigned the loan, Mr. Hudson's claim under Section 1681b(f) must survive summary judgment.

With respect to the April 6, 2012, and January 2, 2014, credit reports, the record demonstrates that NSI had no reason to believe that the loan was fraudulent – the loan had only recently become delinquent, and the first time NSI was notified that Mr. Hudson disputed his status as a cosigner on the loan was January 8, 2014.  No reasonable jury could find that NSI was negligent in believing Mr. Hudson had cosigned the loan application at that time, because it had no reason to believe the loan was fraudulent.  By the time it pulled Mr. Hudson's credit report on May 11, 2014, however, NSI had ample reason to suspect that Mr. Hudson might not have agreed to be a cosigner for Babilonia: it had received information from Attorney Osakwe regarding Mr. Hudson's fraud claim (albeit "incomplete"), was notified that he had filed a police report, and its fraud department was in the process of investigating Mr. Hudson's fraud claim.  A reasonable jury, construing all the evidence in the light most favorable to Mr. Hudson, could find that NSI negligently violated Section 1681b(f) by obtaining his credit report on May 11, 2014, while also possessing such a significant amount of information suggesting that the Babilonia loan was fraudulent.  Summary judgment is therefore denied with respect to Mr. Hudson's Section 1681b(f) claim against NSI with regard to NSI's obtaining the May 11, 2014 credit

report.

Mr. Hudson also claims that NSI knowing and willfully obtained his credit report under false pretenses in violation of 15 U.S.C. § 1681q (making it a crime to "knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses"). A person aggrieved by a violation of Section 1681q may seek damages from the individual who violates that section. *See Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 47 (2d Cir. 1997) ("We join the other Courts of Appeals that have ruled on the question in holding that § 1681n [which creates a private cause of action for consumers against individuals who willfully violate the FCRA] incorporates § 1681q.") *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). There is no evidence in the record that suggests NSI willfully obtained Mr. Hudson's credit report under false pretenses. "[A] user who purports to seek a consumer report for a permissible purpose, while secretly seeking the report for an impermissible purpose, is subject to liability under the FCRA for obtaining information under false pretenses." *Allen v. Calvo*, 832 F. Supp. 301, 303 (D. Or. 1993). While NSI was on notice on May 11, 2014, that Mr. Hudson was claiming the loan was fraudulent, there is no evidence in the record that NSI was seeking the report for some "secret impermissible purpose."

Because a reasonable jury could find that NSI negligently obtained Mr. Hudson's credit report in violation of Section 1681b(f), however, I deny summary judgment on Count Three.

### 2. Progressive – Count Three (Obtaining Mr. Hudson's Credit Report)

Mr. Hudson asserts the same claim against Progressive – that it obtained his credit report without a permissible purpose. The record shows that Progressive obtained Mr. Hudson's credit report twice after receiving the Babilonia loan account from NSI: once on August 25, 2014, and again on August 27, 2014. (Experian Report, ECF No. 58-8, at 11–12.) Progressive argues that

it obtained Mr. Hudson's credit report for the same purpose asserted by NSI: "collection of an account."  *See* 15 U.S.C. § 1681b(a)(3)(A).

Mr. Hudson asserts the same argument he raised against NSI, i.e., that Mr. Hudson was not in fact involved in the Babilonia loan, and Progressive responds that it had no reason to believe that the Babilonia loan was fraudulent because NSI provided it with no information suggesting that Mr. Hudson had disputed the loan.  This is true for the first credit report Progressive obtained on August 25, 2014: Progressive had not communicated with Mr. Hudson at this point and the record indisputably shows that Progressive was not informed by NSI that Mr. Hudson had disputed the loan.  *See, e.g.*, *Shostack v. Diller*, 2015 WL 5535808, at *10 (S.D.N.Y. Sept. 16, 2015) ("At the time Lending Tree ran Shostack's credit report, it had no reason to know that he had not authorized the transaction. And contrary to the conclusory allegations in the amended complaint, there is nothing in the FCRA that imposes an affirmative duty on Lending Tree to call Shostack before running his credit report to verify that the information that it received online was . . . valid . . ." (internal quotation marks omitted)).

The same cannot be said, however, about Progressive's obtaining Mr. Hudson's credit report on August 27, 2014.  A Progressive representative spoke with Ms. Hudson the same day, and during that conversation, Ms. Hudson unambiguously informed the Progressive representative that she was Mr. Hudson's wife, that Mr. Hudson has contested the validity of the Babilonia loan, that the Hudsons were represented by an attorney in the matter, that they had filed a police report, and that they had sent NSI information about their identity theft claim (Ms. Hudson appeared to believe she was speaking to an NSI representative during the call).  Because the evidence in the record does not show what time Progressive obtained Mr. Hudson's credit report on August 27, 2014, a reasonable jury could infer that it obtained the credit report after

receiving this information from Ms. Hudson.  Thus, as with NSI, a reasonable jury could find

that Progressive negligently violated Section 1681b(f) by obtaining Mr. Hudson's credit report

while possessing a significant amount of information indicating that he had not agreed to cosign

the Babilonia loan.

      While no reasonable jury could find that Progressive negligently obtained Mr. Hudson's

credit report for an impermissible purpose on August 25, 2014, it could find that Progressive did

so when it obtained Mr. Hudson's credit report again on August 27.  As a result, summary

judgment is denied as to Count Three.

### 3.   NSI – Count Four (Dispute Investigation)

      With respect to Count Four, NSI argues that it made a reasonable and timely

investigation after receiving dispute notifications from the CRAs regarding the Babilonia loan.

15 U.S.C. § 1681s-2(b) requires a furnisher of credit information,

> [a]fter receiving notice [of a dispute] . . . with regard to the completeness or
> accuracy of any information provided by a person to a consumer reporting
> agency, . . . [to] (A) conduct an investigation with respect to the disputed
> information; (B) review all relevant information provided by the consumer
> reporting agency pursuant to section 1681i(a)(2) . . .; [and] (C) report the results
> of the investigation to the consumer reporting agency.

Courts have construed Section 1681s-2(b) to require that a furnisher of credit information make a

reasonable investigation into a consumer dispute received from a CRA.  *See Dickman v. Verizon

Comms., Inc.*, 876 F. Supp. 2d 166, 172 (E.D.N.Y. 2012) ("While the Second Circuit has not yet

defined the specific contours of a furnisher's investigatory responsibility under this statute,

courts both within and outside the Circuit have assumed a reasonableness standard for judging

the adequacy of the required investigation." (internal quotation marks and alterations omitted)).

"Whether a defendant's investigation is reasonable is a factual question normally reserved for

trial, but summary judgment is proper if the reasonableness of the defendant's procedures is

beyond question and if the plaintiff has failed to adduce evidence that would tend to prove that the investigation was unreasonable." *Alston v. United Collections Bureau, Inc.*, Civ. Action No. DKC 13-0913, 2014 WL 859013, at *7 (D. Md. March 4, 2014).

In his memorandum, Mr. Hudson provides extensive authority on the requirements set forth by Section 1681s-2(b) and case law interpreting those requirements, but wholly fails to identify how, under the evidence in the record, NSI failed to conduct a reasonable investigation upon receiving the ACDVs. (*See* Pls.' MSJ Opp. Mem. at 21–25.) Nonetheless, the record is not such that the reasonableness of NSI's procedures is "beyond question." NSI relied on its previous investigation into Mr. Hudson's fraud claim when it reported to the CRAs that the information on the Babilonia loan account was accurate. After reviewing its files and concluding that there was no "additional information" in the ACDVs, NSI reported to the CRAs that the loan information was accurate. (Austin Aff. ¶ 48.) If NSI's previous investigation was unreasonable, however, it would not be entitled to rely on the results of that investigation in responding to the ACDVs. In other words, because there is no evidence that NSI engaged in any additional investigative measures in responding to the ACDVs, if its previous investigation was unreasonable, its "investigation" in response to the ACDVs was unreasonable.

Construing the evidence in the record in the light most favorable to Mr. Hudson, and drawing all reasonable inference in his favor, a reasonable jury could find that NSI's investigation was unreasonable. It is reasonable to infer that NSI received Mr. Hudson's police report by the time it reached its conclusion because NSI contacted the Windsor Police Department during its initial investigation, and the police report was dated February 25, 2014. (Austin Aff. ¶ 42.) There is also evidence that Attorney Osakwe sent a copy of the police report to NSI on July 17, 2014. (Austin Aff. Ex. N (letter from Osakwe containing a copy of the police

report).)  The police report itself shows that Mr. Hudson told the police that he was the victim of

an identity theft by Defendant Aisha Babilonia, that he had never cosigned a student loan for

anyone, and that the Connecticut address used on the application made to NSI was his mother's

address – all of which is consistent with what Mr. Hudson told NSI as early as January 13, 2014.

Further, NSI was aware that Mr. Hudson's cell phone, which was the only phone number at

which it was able to reach him in January 2014, was not listed on the original loan application.

(*See* January 13, 2014 Call. Tr. (NSI representative telling Mr. Hudson that he had to "search" to

find Mr. Hudson's cell phone number).)  After speaking with Mr. Hudson, receiving the police

report, and receiving the information in Mr. Hudson's identity theft affidavit, NSI also had

reason to doubt that Mr. Hudson had any connection to the Brooklyn address listed in the loan

application.

NSI argues that its conclusion resulting from its investigation was reasonable because

Mr. Hudson provided "incomplete and conflicting information," and cites the fact that Mr.

Hudson failed to inform NSI that Rondell had access to his personal identifying information.

These facts would not preclude a reasonable jury from finding that NSI's investigation was

unreasonable.  NSI does not explain why the information Mr. Hudson provided was

"inconsistent."  Presumably, NSI is referring to Mr. Hudson's statement during the initial

January 8, 2014 call in which he said that he was a cosigner and that he had a mailing address at

436 Park Place.  After listening to the actual recording of the call (Navient Defs.' MSJ Ex. H), a

reasonable jury could find that Mr. Hudson was confused during the call: he was driving at the

time and sounds unsure about his answers to Kenn's questions.  Later in the conversation, Mr.

Hudson made it clear that he had not received any documentation and that he assumed that when

Kenn referred to "her" and "she" and "the borrower," that Kenn was referring to Aleeshia, his

wife.  The recording is clear enough to enable a reasonable jury to conclude that Mr. Hudson

said "Aleeshia," and not "Aisha," the borrower's name.  Further, Mr. and Ms. Hudson separately

called NSI soon after that initial conversation and stated that Mr. Hudson did not cosign the loan.

A reasonable jury could find that it was unreasonable for NSI to rely on Mr. Hudson's

answers during that initial conversation when, for the remainder of 2014, he adamantly and

consistently disputed the validity of the loan.  With respect to NSI's claim that Mr. Hudson

provided NSI with incomplete information (including his failure to inform NSI about Rondell), it

fails to demonstrate that the information it did receive from Mr. Hudson supported a reasonable

conclusion that the loan was valid.  Because NSI had information that would have supported a

finding that the loan was fraudulent, because it took no further steps to investigate,[18] and because

it relied on its previous determination in responding to the ACDVs, a reasonable jury could find,

based on the evidence in the record, that NSI's investigation resulting from the CRAs' dispute

notices was unreasonable.  Thus, I deny NSI summary judgment as to Count Four.

#### 4.  Progressive – Count Four (Dispute Investigation)

In Count Four, Mr. Hudson claims that Progressive also failed to make a reasonable

investigation of his credit dispute in violation of 15 U.S.C. § 1681s-2(b).  Progressive argues that

it did not furnish any credit information to any CRA, and as a result, it is not subject to the

requirements of Section 1681s-2(b).  In their statement of facts, Plaintiffs "admit[] that

PFS/Progressive did not furnish information to any CRA for Mrs. Hudson or Mr. Hudson."

(Pls.' SOF (Progressive) ¶ 7.)  While they qualify that statement with a denial that Progressive's

"inquiries in Mr. Hudson's credit report were not derogatory" (*id.*), that claim is relevant only to

---

[18] While NSI asserts that it contacted the Windsor Police Department during its investigation, it does not
state whether it received any additional information during that conversation, let alone whether any such
information supported a finding that Mr. Hudson had falsely asserted a fraud claim.

his claim in Count Three (asserting that Progressive unlawfully obtained Mr. Hudson's credit report), not Count Four.

Progressive was not bound by the obligations of Section 1681s-2(b) because it did not furnish any information to any CRA.  Nor did it receive any dispute notification from any CRA, a prerequisite to liability under Section 1681s-2(b).  *See Dickman*, 876 F. Supp. 2d at 172 ("Under § 1681s-2(b), a defendant has no duty to investigate a credit dispute unless defendant received notice of the dispute *from a consumer reporting agency*." (emphasis added) (internal quotations marks and alterations omitted)).  Because there is no factual basis in the record to support a reasonably jury's finding that Progressive violated Section 1681s-2(b), summary judgment is granted in Progressive's favor on Count Four.

### E.  FDCPA Claims (Count Five)

In Count Five, Mr. Hudson claims that NSI and Progressive violated the FDCPA by (1) contacting him without his permission even when they knew he had an attorney, in violation of 15 U.S.C. § 1692c(a)(2); (2) falsely representing the character, amount, or legal status of the Babilonia debt in violation of 15 U.S.C. § 1692e(2)(a); (3) threatening to take action that cannot legally be taken in violation of 15 U.S.C. § 1692e(5); (4) communicating credit information to the CRAs that they knew or should have known to be false, including the failure to communicate to the CRAs that Mr. Hudson disputed the Babilonia loan in violation of 15 U.S.C. § 1692e(8); (5) falsely representing that they had a permissible purpose to obtain Mr. Hudson's credit information in violation of 15 U.S.C. § 1692e(10); and (6) failing to send Mr. Hudson a timely notice of the amount of debt Mr. Hudson owed and the name of the creditor when Mr. Hudson disputed the validity of the debt in violation of 15 U.S.C. § 1692g(a).  (Compl. ¶ 52.)  Because NSI is not a "debt collector" under these provisions, I grant it summary judgment on this count.

I deny Progressive summary judgment on Mr. Hudson's FDCPA claim because a reasonably jury could find that Progressive contacted Mr. Hudson by sending a letter to his house after Progressive was informed that he was represented by counsel.  I also find, however, that no evidence in the record supports any of the other theories under the FDCPA set forth in Mr. Hudson's complaint, and deny summary judgment only as to the theory related to Progressive's contacting Mr. Hudson after learning that he was represented by counsel.

### 1.  NSI

NSI argues that it is entitled to summary judgment on the FDCPA claims because it is not a "debt collector," and thus is not subject to the FDCPA's requirements.  I agree.  The FDCPA defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  It excludes from the definition of debt collector:

> any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was originated by such person [or] concerns a debt which was not in default at the time it was obtained by such person.

15 U.S.C. § 1692a(6)(F).  It is undisputed that NSI originated the Babilonia loan.  It is also undisputed that the Babilonia loan was not in default when NSI "obtained" it.  As a result, NSI is not a debt collector with respect to its actions in this case, and Mr. Hudson's FDCPA claims against it fail as a matter of law.  *See, e.g.*, *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 183 (2d Cir. 2014) ("[T]he amended complaint does not allege that CitiMortgage acquired Roth's debt after it was in default and so fails to plausibly allege that CitiMortgage qualifies as a debt collector under FDCPA." (citing 15 U.S.C. § 1692a(6)(F)(iii))); *Fournier v. Bank of Am. Corp.*, 2014 WL 421295, at *6 (N.D.N.Y. Feb. 4, 2014) ("[I]t is clear from the mortgage that BANA is the

43

original lender. . . . Therefore, the Court concludes that because BANA originated the loan, the express language of the FDCPA precludes any claims against BANA."). I grant summary judgment in favor of NSI as to Count Five because it is not a debt collector under the FDCPA.[19]

### 2. Progressive

Progressive contends that it is entitled to summary judgment because none of its actions in servicing the Babilonia loan violated the FDCPA. First, it asserts that because Mr. Hudson did not dispute the debt with Progressive in writing, 15 U.S.C. § 1692g(b) somehow bars any FDCPA claim. Progressive misconstrues that statutory provision. Section 1692g(b) states, in relevant part,

> If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section that the debt . . . is disputed . . . the debt collector shall cease collection of the debt . . . until the debt collector obtains verification of the debt or a copy of the judgment . . . and a copy of such verification or judgment . . . is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) of this section unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed . . . .  Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt . . .

15 U.S.C. § 1692g(b). This provision does not, as Progressive contends, disqualify a plaintiff from bringing an FDCPA claim if he fails to dispute the debt in writing. Rather, the provision instructs a debt collector to cease collection of the debt if the consumer disputes the debt until the debt is verified, and *any* collection activities and communications not otherwise violating the FDCPA if that consumer disputes the debt in writing. It does not follow that because Mr.

---

[19] Plaintiffs assert in the section of their opposition memorandum pertaining to Count Five that the Navient Defendants violated certain Connecticut consumer protection regulations. (*See* Pls.' Mem. Opp. (Navient) at 30–32.) Because no such allegations are asserted in their complaint, I disregard those claims. *See Wright*, 152 F.3d at 178 (a party "is not entitled to amend its complaint through statements made in motion papers").

Hudson did not dispute the Babilonia loan in writing with Progressive, he waives his right to assert any claims under the FDCPA.  Further, the cases cited by Progressive in support of this "standing" argument do not support it.  In *Lindbergh v. Transworld Sys., Inc.*, 846 F. Supp. 175, 179 (D. Conn. 1994), the court found that no evidence supported the plaintiff's FDCPA claim, stated that it could "only wonder why the plaintiff has chosen to impose the significant burden of litigation on both the defendant and this court, instead of simply following the cost-effective procedures provided by" the FDCPA, and noted, "the plaintiff's position ignores the importance of Section 1692g—which serves to obviate the need for litigation except where a debt collector has behaved knowingly, or at least recklessly, in violation of the statute."  This discussion does not suggest that by failing to pursue the procedures in Section 1692g, a plaintiff loses his right to sue under the FDCPA.  Instead, the *Lindbergh* court simply was pointing out that the FDCPA creates a formal route for consumers to seek speedy resolution of wrongful collection efforts without going to court.  In *Richmond v. Higgins*, the Eighth Circuit stated that a debt collector is entitled to "assume that a debt is valid" if the consumer fails to properly dispute a debt under Section 1692g(b), but in no way suggested that a plaintiff waives his right to sue by not utilizing the procedures set forth in that provision.  435 F.3d 825, 828–29 (8th Cir. 2006).  Nor do the courts' discussions in *Bleich v. Revenue Maximization Group, Inc.*, 233 F. Supp. 2d 496, 500–02 (E.D.N.Y. 2002), or *Bayshore v. Resurgent Capital Servs., LP*, No. 4:10-cv-585, 2011 WL 1304461 (E.D. Tex. March 15, 2011), support Progressive's argument.  As a result, I reject Progressive's contention that Mr. Hudson cannot assert FDCPA claims because he failed to dispute the Babilonia loan with Progressive in writing.

Other than its argument that Mr. Hudson is precluded from raising FDCPA claims because he did not dispute the Babilonia loan in writing, Progressive raises only a vague

argument in its summary judgment memorandum, asserting that its actions generally complied with the FDCPA.  Progressive does not address the specifics of Mr. Hudson's FDCPA claims asserted in the complaint, such as the claim that Progressive sent Mr. Hudson a collection letter on September 24, 2014, after Ms. Hudson notified a Progressive representative on August 27, 2014, that Mr. Hudson was represented by an attorney with regard to the Babilonia loan, in violation of 15 U.S.C. § 1692c(a)(2) ("[A] debt collector may not communicate with a consumer in connection with the collection of any debt . . . if the debt collector knows the consumer is represented by an attorney with respect to such debt . . .").  Even if Progressive had argued that it is entitled to summary judgment on this claim, the Court would have to deny the motion.  The evidence makes clear that Ms. Hudson informed the Progressive representative with whom she spoke on August 27, 2014, that Mr. Hudson was represented by an attorney with regard to his dispute of the Babilonia loan.  (*See* August 27, 2014 Call Tr. at 1 ("Ms. Hudson: The account that you're calling about, the attorney has already sent out all of the information to you guys, and I also gave you guys information not to call us.  Any correspondence you have, you need to call our attorney.  I will give you his number.  Cialkowski: Ok, ma'am.  What is the attorney for, so that I know?  Ms. Hudson: Because the information that was used, we have nothing to do with it. It is fraudulent.  We went to the police station and filed a police report.  All the information and all of that was done and we sent it to you guys.  Cialkowski: Alright.  What is your attorney's name?  Ms. Hudson:  It is Gregory and the phone number is [redacted].").  In its reply memorandum, Progressive asserts (for the first time) that Ms. Hudson did not give the Progressive representative sufficient information about Mr. Hudson's attorney, such as his last name or firm name, or the matter for which the attorney represented Mr. Hudson.  With respect to Ms. Hudson's failure to provide the attorney's last name or firm name, Progressive provides

no authority for the proposition that such information must be provided to a debt collector to trigger Section 1692c(a)(2), and the statutory language forecloses it. *See* 15 U.S.C. 1692c(a)(2) (barring communication with consumer "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, *or can readily ascertain*, such attorney's name and address . . ." (emphasis added)).  Ms. Hudson provided Progressive the attorney's first name and phone number – it is unclear why Progressive would have needed any further information about the attorney to contact him.  Further, Progressive's claim that Ms. Hudson did not describe the matter for which the attorney represented Mr. Hudson is simply incorrect: Ms. Hudson explicitly told the Progressive representative during the call that an attorney was handling Mr. Hudson's claim that the Babilonia loan was fraudulent.  (*See* Pls.' MSJ Opp. Ex. 7.)

Progressive also argues that it did not "know" that Mr. Hudson was represented by an attorney with regard to this debt because it was Ms. Hudson, not Mr. Hudson, that informed it of this fact, and because Ms. Hudson thought she was speaking to an NSI representative during the call.  Neither of these facts rebut Mr. Hudson's claim that Progressive was on notice Mr. Hudson was represented by an attorney.  Ms. Hudson told the Progressive representative, in no uncertain terms, "Any correspondence you have, you need to call our attorney."  (*Id.*)  There is no doubt that a reasonable jury could find that, after that phone call, Progressive "knew" that Mr. Hudson was represented by an attorney with regard to the Babilonia loan, and as a result, Progressive violated Section 1692c(a)(2) by sending Mr. Hudson a collection letter on September 24, 2014.  I therefore deny Progressive summary judgment as to Count Five.

Mr. Hudson's remaining claims under the FDCPA against Progressive, however, may not proceed to trial because they are not supported by any evidence in the record.  First, Mr. Hudson

asserts that Progressive "falsely represented the character, amount or legal status of a debt owed by" Mr. Hudson in violation of 15 U.S.C. § 1692e(2)(A).  (Compl. ¶ 52.)  The complaint does not specify what statement Progressive made to Mr. Hudson that constituted a false representation of the character, amount, or legal status of the Babilonia loan, and no evidence in the record supports any assertion that Progressive made any false representation to Mr. Hudson.  As a result, I grant summary judgment in Progressive's favor on Mr. Hudson's Section 1962e(2)(A) claim.  I reach the same conclusion for Mr. Hudson's claims under Section 1692e(5) (that Progressive "threatened to take action that cannot legally be taken") and Section 1692e(8) (that Progressive "communicated to the CRAs . . . information [it] knew or should have known to be false[,] including the failure to communicate to the CRAs that the [l]oan debt [was] disputed").  There is no evidence that Progressive made any threat of taking action against Mr. Hudson that it was not legally entitled to take, nor is there evidence that Progressive furnished any information to any CRA.  Summary judgment is therefore granted in Progressive's favor as to those claims.  Further, as addressed above, Mr. Hudson's claim that Progressive used "false representations that [it] had a permissible purpose to obtain" his credit report in violation of 15 U.S.C. § 1692e(10) fails.  While a reasonable jury could find that Progressive was negligent in obtaining Mr. Hudson's credit report on the second occasion when it had reason to believe he had not cosigned the Babilonia loan, there is no evidence that it made "false representations" in doing so.  Summary judgment is therefore granted in Progressive's favor as to Mr. Hudson's Section 1692e(10) claim.

Finally, Mr. Hudson's claim that Progressive violated 15 U.S.C. § 1692g(a) by failing to make the disclosures set forth in that subsection is not supported by the evidence.  Section 1692g(a) states,

> Within five days after the initial communication with a consumer in connection
> with the collection of any debt, a debt collector shall, unless the following
> information is contained in the initial communication or the consumer has paid
> the debt, send the consumer a written notice containing . . . (1) the amount of the
> debt; (2) the name of the creditor to whom the debt is owed; (3) a statement that
> unless the consumer, within thirty days after receipt of the notice, disputes the
> validity of the debt, or any portion thereof, the debt will be assumed to be valid by
> the debt collector; (4) a statement that if the consumer notifies the debt collector
> in writing within the thirty-day period that the debt, or any portion thereof, is
> disputed, the debt collector will obtain verification of the debt or a copy of a
> judgment against the consumer and a copy of such verification or judgment will
> be mailed to the consumer by the debt collector; and (5) a statement that, upon the
> consumer's written request within the thirty-day period, the debt collector will
> provide the consumer with the name and address of the original creditor, if
> different from the current creditor.

Progressive's August 26, 2014 letter, which was its first communication to Mr. Hudson regarding the Babilonia loan, included all of these disclosures.  (*See* Pls.' MSJ Opp. Ex. 6 (copy of October 26, 2014 letter).)  Even if that letter did not reach Mr. Hudson before Ms. Hudson spoke to the Progressive representative the following day, the letter was sent within "five days after the initial communication."  As a result, no reasonable jury could find that Progressive violated the FDCPA by failing to make the required disclosures set forth in Section 1692g(a).

Because a reasonably jury could find that Progressive knew Mr. Hudson was represented by an attorney when it sent him a collection letter on September 24, 2014, I deny summary judgment as to Mr. Hudson's claim against Progressive under 15 U.S.C. § 1692c(a)(2).  The remaining FDCPA claims Mr. Hudson asserts against Progressive, however, wholly lack evidentiary support.  Summary judgment is therefore granted in Progressive's favor as to those claims.

## IV.   Conclusion

For the reasons set forth above, summary judgment is GRANTED on all claims made against Navient Corp. and Sallie Mae Bank.  Summary judgment is GRANTED with respect to

all claims asserted by Ms. Hudson.  As to the claims asserted by Mr. Hudson, NSI's motion for

summary judgment is GRANTED in part (as to Counts One, Two, and Five) and DENIED in

part (as to Count Three and Four), and Progressive's motion for summary judgment is

GRANTED in part (as to Counts Two and Four) and DENIED in part (as to Counts Three and

Five).  The Navient Defendants' Motion to Strike (ECF No. 121) is DENIED.


IT IS SO ORDERED.


                                        /s/
                                   Michael P. Shea, U.S.D.J.


Dated:         Hartford, Connecticut
               June 14, 2016